## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## WINCHESTER DIVISION

I.P., a minor, by and through B.P.,

        *Plaintiff,*

    v.

TULLAHOMA CITY SCHOOLS, a
political subdivision of the State of
Tennessee; JASON QUICK, in his
individual capacity; and DERRICK
CRUTCHFIELD, in his individual
capacity,

        *Defendants.*

Case Number:  4:23-cv-26

**VERIFIED COMPLAINT FOR
CIVIL RIGHTS VIOLATIONS**

**JURY TRIAL DEMANDED**

---

Darrick L. O'Dell
   (BPR#26883)
SPICER RUDSTROM, PLLC
414 Union St., Ste. 1700
Nashville, TN 37219
(615) 259-9080
dlo@spicerfirm.com

Conor T. Fitzpatrick
   (Mich. Bar No. P78981)*
Harrison M. Rosenthal
   (Pa. Bar. No. 332452)*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Ste. 1250
Philadelphia, PA 19106
(215) 717-3473
conor.fitzpatrick@thefire.org
harrison.rosenthal@thefire.org

*\*Pro Hac Vice* Motions Forthcoming

*Counsel for Plaintiff*

## **INTRODUCTION**

1.      This case is about a thin-skinned high school principal defying the First Amendment and suspending a student for lampooning the principal on the student's Instagram page even though the posts caused no disruption at school.

2.      Plaintiff I.P. posted three images about his Tullahoma High School principal, Defendant Jason Quick. One showed Quick holding a box of vegetables, another (which I.P. merely reposted) showed Quick in a dress with cat ears and whiskers, and the third showed Quick's face on a video game character being hugged by a cartoon bird. I.P. intended the images to satirize, in I.P.'s view, Quick's overly serious demeanor. I.P. posted each image from his own device, off campus, and on his own time.

  

3.      The First Amendment bars public school employees from acting as a round-the-clock board of censors over student expression. The Supreme Court has been clear: Unless a student's off-campus expression causes a substantial disruption at school, the job of policing their speech falls to parents, not the government. And "courts must be more skeptical of a school's efforts to regulate off-campus speech, for

doing so may mean the student cannot engage in that kind of speech at all." *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038, 2046 (2021).

4. Here, Quick tried to ensure students could not satirize him "at all." But I.P., like every American, has a First Amendment right to satirize or criticize government officials without fear of retribution so long as he does so in a way that does not substantially disrupt or threaten to substantially disrupt school. Indeed, "from the early cartoon portraying George Washington as an ass down to the present day . . . satirical cartoons have played a prominent role" in American expression. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 54 (1988).

5. To suspend I.P., Quick relied on a Tullahoma High School policy prohibiting students, whether at home or school, from posting pictures that "result[] in the embarrassment, demeaning, or discrediting of any student or staff," regardless of whether the pictures substantially disrupt the school day. That policy is squarely unconstitutional under *Mahanoy*, and so is I.P.'s suspension.

6. Tullahoma High School also prohibits students from engaging in social media activity "unbecoming of a Wildcat." Because this vague policy fails to provide citizens sufficient guidance to inform them how to stay within the law, it is equally unconstitutional.

7. Quick's status as I.P.'s Principal does not allow him to override I.P.'s First Amendment rights. I.P. brings this lawsuit to protect the core First Amendment right of Tullahoma students to express themselves and satirize those in power.

## THE PARTIES

*Plaintiff*

8.      Plaintiff I.P. is a junior at Tullahoma High School and will begin his senior year in August 2023. At all times relevant to this Complaint, I.P. was a student in Tullahoma City Schools. I.P. lives in Franklin County, Tennessee. B.P. is I.P.'s mother. B.P. brings this action on behalf of her minor son, I.P.

9.      I.P. posted three images satirizing his high school principal on his personal Instagram account outside of school hours and away from school property. Based on this speech, the Principal, Defendant Jason Quick, and the Assistant Principal, Defendant Derrick Crutchfield, suspended I.P. for three days.

*Defendants*

10.     Defendant Tullahoma City Schools (the "School District") is a school district headquartered in Tullahoma, Tennessee. The School District includes Tullahoma High School (grades 9–12), a public high school located in Tullahoma, Tennessee.

11.     Defendant Jason Quick was employed by the School District as a Principal at Tullahoma High School during the 2022–2023 school year and, in that role, enforced School District policy. Quick suspended I.P. from school for three days for posting three nondisruptive, nonthreatening images satirizing Quick on I.P.'s personal Instagram page. Quick departed Tullahoma High School at the end of June 2023.

12.    At all times relevant to this Complaint, Quick acted under color of state law as the Principal of Tullahoma High School. I.P. sues Quick in his individual capacity.

13.    Defendant Derrick Crutchfield is employed by the School District as an Assistant Principal at Tullahoma High School and, in that role, enforces School District policy. Crutchfield suspended I.P. from school for three days for posting three nondisruptive, nonthreatening images satirizing Quick on I.P.'s personal Instagram page.

14.    At all times relevant to this Complaint, Crutchfield acted under color of state law as the Assistant Principal of Tullahoma High School. I.P. sues Crutchfield in his individual capacity.

## JURISDICTION AND VENUE

15.    This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201–02.

16.    Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction).

17.    I.P. seeks injunctive relief against the School District's social media and Wildcat policies as well as an expungement of I.P.'s suspension. I.P. also seeks a declaration that the School District's social media and Wildcat policies violate the First and Fourteenth Amendments and that I.P.'s suspension violated the First and Fourteenth Amendments.

18.     Venue is proper in the Eastern District of Tennessee under 28 U.S.C. § 1391(b)(1) because at least one of the Defendants resides in this District and all Defendants reside in Tennessee.

19.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to I.P.'s claims occurred within this district.

## FACTUAL ALLEGATIONS

**I.P. Posted Three Nondisruptive Images on Instagram Satirizing Principal Quick.**

20.     I.P. is a rising senior at Tullahoma high school and plays the trombone in the Tullahoma High School band. I.P. has a 3.4 GPA, attended the Tennessee Governor's School for the Arts, and earned seats in the Middle Tennessee School Band and Orchestra Association's Mid-State Gold Band. In August 2022, I.P. was the Senior Patrol Leader of his Boy Scout Troop.

21.     I.P. created a personal Instagram account when he was 12 and uses it to share photographs and other content with friends and family.

22.     Instagram is a social media site and application where users post pictures and videos accompanied by captions.

23.     Quick was the Principal at Tullahoma High School during I.P.'s freshman, sophomore, and junior years.

24.     During his freshman and sophomore years, I.P. came to view Principal Quick as presenting himself to students in an unnecessarily serious manner.

25.     I.P. finished his sophomore year at Tullahoma High School on May 20, 2022.

26.     On May 22, 2022, from his father's home in Alabama during the summer vacation, I.P. posted an image created by another user to I.P.'s personal Instagram that lampooned Quick's overly serious demeanor.

27.     The May 22 post showed Quick holding a box of fruit and vegetables, a photo originally posted by Quick to his own social media account:



28.     Another poster added text "🔥My brotha🔥" to the image. I.P. saved that post and added text "like a sister but not a sister <33" to suggest a close friendship between I.P. and Quick and to provide a humorous contrast to Quick's overly serious demeanor towards I.P. and other students.

29.     I.P. added the text "On god" to the image, an informal phrase intended to signify a speaker's firm belief in a message.

30.     On June 9, 2022, during a family vacation to Italy, I.P. reposted an image created by another user to his personal Instagram page showing Quick as an anime cat, with whiskers, cat ears, and wearing a dress:



31.     The image includes the text "Neko quick" because "Neko" means cat in Japanese.

32.     The image includes the text "Nya!" because "Nya" is onomatopoeia used in anime for the sound of a cat meowing.

33.     I.P. reposted the image to provide a satirical commentary on Quick's desire to be seen by students as a serious and professional administrator.

34.     On August 2, 2022, while at home following the second day of school, I.P. posted an image to his personal Instagram account showing Quick's head superimposed on a hand-drawn cartoon meant to resemble a character from the online game *Among Us*. The image also shows a cartoon bird named Mordecai, from the Cartoon Network series *Regular Show*, shown clinging to Quick's leg:



35.     I.P. included the text "Nooo Jason Don't Lea ve Me" to imply Quick had a relationship with a cartoon bird, again providing a satirical commentary on Quick's desire to be seen by students as a serious and professional academic administrator.

36.     I.P. posted or reposted the three images on his own time, outside school hours, not on school property, and without any connection to school-sponsored events.

37.     I.P. posted or reposted the images from his personal mobile phone, a device not owned or controlled by the School District.

38.     I.P. did not "tag" (use an "@" symbol to communicate with or call attention to a specific account) Quick or the school in the posts or otherwise take any action to make Quick or the school aware of the images.

39.     I.P. is not aware of any material disorder, substantial disruption, or invasions of the rights of others at Tullahoma High School related to the posts.

40.     Tullahoma High School did not experience material disruption or substantial disorder due to I.P.'s Instagram posts, nor did I.P.'s posts invade the rights of others.

41.     I.P. is not aware of Tullahoma High School receiving any complaints from students or staff about the posts, classes being cancelled or interrupted because of the posts, or anyone reporting feeling harassed by the posts.

42.     Upon information and belief, Tullahoma High School did not receive complaints from students or staff about the posts, classes were not cancelled or interrupted due to the posts, and no one reported feeling harassed or threatened by the posts.

43.     I.P. is not aware of the School District receiving any information which would have led it to reasonably forecast a material disruption, substantial disorder, or invasions of the rights of others if a student like I.P. posted, on their own time away from campus, nonthreatening, nondisruptive images satirizing Quick.

44.     Upon information and belief, the School District had not received information which would have led it to reasonably forecast a material disruption, substantial disorder, or invasions of the rights of others if a student like I.P. posted, on their own time away from campus, nonthreatening, nondisruptive images satirizing Quick.

**Tullahoma High School Policy Prohibits Private Expression "Discrediting" School Staff and Social Media Posts "Unbecoming of a Wildcat."**

45.     Tullahoma High School distributes a Student and Parent/Guardian Handbook containing rules regarding students' social media posts.

46.     The policy in place for Tullahoma High School during the 2022–2023 school year provides, in relevant part, the following:

> Any student who records and/or disseminates in any manner an unauthorized or misrepresented photograph, video, or recording for the purpose of embarrassing, demeaning, or discrediting the reputation of any student or staff, or that results in the embarrassment, demeaning, or discrediting of any student or staff, or results in any action or activity disruptive to the educational process shall be subject to disciplinary action up to and including suspension or expulsion at the discretion of the principal.

> Any student violating this policy's restrictions may have the device confiscated and be subject to disciplinary action at the principal's discretion . . . This action may include out-of-school suspension.

(Ex. A: 2022-23 Student and Parent/Guardian Handbook, at 9 [the "Social Media Policy."])

47.     The Handbook provides no guidance to students or parents regarding what constitutes material "embarrassing, demeaning, or discrediting the reputation" of another. (*Id*.)

48.     The School District did not provide I.P. or his parents guidance or instruction on what constitutes "embarrassing, demeaning, or discrediting" materials prior to I.P.'s suspension.

49. Upon information and belief, the School District provides administrators, teachers, and staff no guidance regarding what material "embarrass[es], demean[s], or discredit[s] the reputation" of another.

50. The Handbook provides that, "Participation in activities, groups, and teams is a privilege at Tullahoma High School. Using social media by a student 'unbecoming of a Wildcat' may result in discipline, including suspension or removal from the activity, group, leadership position, or team." (Ex. A at 8 [the "Wildcat Policy]".)

51. The Handbook provides no guidance to students or parents regarding what constitutes a social media post "unbecoming of a Wildcat."

52. The School District has not provided I.P. or his parents guidance or instruction on what constitutes social media activity "unbecoming of a Wildcat."

53. Upon information and belief, the School District provides administrators, teachers, and staff no guidance regarding what constitutes a social media post "unbecoming of a Wildcat."

54. The Handbook includes a Code of Conduct that provides, in relevant part, "[t]hese misbehaviors apply to student conduct on school buses, on school property, and while students are on school-sponsored outings." (*Id.* at 10.)

55. The Handbook contains a policy titled "Tullahoma High School Corrective Actions[,]" providing that, "[a]ll discipline is up to the discretion of the administration." (*Id.* at 17) (emphasis removed).

**Quick and Crutchfield Suspend I.P. For His Satirical Instagram Posts.**

56. On August 10, 2022, eight days after I.P.'s third Instagram post about Quick, I.P.'s band teacher, Justin Scott, informed I.P. after classes had been dismissed that I.P. needed to go to the Tullahoma High School front office and that Scott would escort him there.

57. I.P. did not know why Scott was bringing him to the front office.

58. After arriving in the front office, Scott escorted I.P. to Principal Quick's private office where Quick and Crutchfield were waiting.

59. After I.P. arrived, Quick ordered I.P. to read the Social Media Policy out loud to Quick, Crutchfield, and Scott.

60. I.P. complied with Quick's order and read the Social Media Policy to Quick, Crutchfield, and Scott.

61. Quick questioned I.P. about the three Instagram images I.P. posted on his Instagram page. Quick asked I.P. what the images meant and asked why I.P. would post them.

62. Quick directed I.P. to go to Crutchfield's private office.

63. I.P. followed Quick's instructions and followed Crutchfield into Crutchfield's office, with Quick remaining in his private office.

64. Crutchfield told I.P. he would receive a five-day, out-of-school suspension.

65. Upon information and belief, Quick asked Crutchfield to inform I.P. of I.P.'s suspension in order to create the appearance Quick was not personally involved in I.P.'s suspension.

66.     Upon information and belief, Quick was personally involved in the suspension by instructing Crutchfield to suspend I.P. for posting the images.

**Learning of His Suspension, I.P. Suffers a Panic Attack.**

67.     At all times relevant to this Complaint, I.P. was receiving medical treatment for clinical depression and anxiety.

68.     At all times relevant to this Complaint, Quick and Crutchfield knew or should have known I.P. was diagnosed with clinical depression and anxiety.

69.     At all times relevant to this Complaint, I.P. had an active 504 Plan with the School District detailing I.P.'s accommodations designed to assist I.P. with school in light of his conditions.

70.     Quick and Crutchfield knew, or had reason to know, of I.P.'s active 504 Plan before August 10, 2022.

71.     After Crutchfield informed I.P. about the suspension, I.P. became visibly upset and started panicking about how the suspension would affect his future and his standing at Tullahoma High School. I.P. experienced sweating, shortness of breath, and lost feeling in both arms.

72.     Seeing I.P.'s physical symptoms worsening, Crutchfield asked I.P. whether he was "OK?"

73.     I.P., having trouble speaking, mumbled to Crutchfield, "I can't feel my arms."

74.     Crutchfield asked front office personnel whether the school nurse was still on campus.

75.    Crutchfield asked I.P. about B.P.'s whereabouts and where she typically meets I.P after school.

76.    I.P. could not answer Crutchfield because of I.P.'s poor physical and mental state.

77.    Crutchfield called B.P. to tell her she needed to come to the front office. When B.P. asked why, Crutchfield told B.P. it related to an issue about "social media."

78.    When B.P. arrived, Crutchfield was in front of his private office and walked towards B.P.

79.    I.P. was still in Crutchfield's office slumped over a chair, with Scott crouching next to I.P. trying to calm I.P. down.

80.    I.P. was sweating, gagging, flushed, and having trouble breathing. I.P. also had dilated eyes and his hand in a claw-like position.

81.    B.P. attempted to engage with I.P. by, for example, asking whether I.P. could hear her. I.P. was unresponsive.

82.    B.P. called I.P.'s doctor's office, which advised B.P. to take I.P. to an emergency room if his condition did not improve.

83.    B.P. also called I.P.'s mental health counselor and a crisis/mobile response line.

84.    I.P. regained some function, and B.P. helped I.P. take a short-acting anxiety medication.

85.    With I.P. still unable to walk, B.P. requested a wheelchair.

86. B.P. and Crutchfield, who had returned to his office, helped I.P. into a wheelchair and B.P. wheeled I.P. to her car, with the intention of taking I.P. to an emergency room.

87. I.P.'s condition slowly improved and B.P. took I.P. home.

88. Quick and Crutchfield knew or had reason to know that suspending I.P. for nondisruptive satirical Instagram posts would cause I.P. emotional distress.

89. Upon information and belief, Quick intended to cause I.P. emotional distress to deter I.P. from satirizing Quick going forward.

90. Quick and Crutchfield caused I.P. emotional distress by suspending I.P. for nondisruptive satirical Instagram posts.

**School Confirms I.P. Suspended for I.P.'s Social Media Posts About Quick.**

91. On Friday, August 12, 2022, B.P., seeking more information about I.P.'s suspension, met with Crutchfield and then Quick at Tullahoma High School.

92. When B.P. met Crutchfield, Crutchfield informed B.P. he reduced I.P.'s suspension to three days, saying he had "reviewed" the situation and believed three days to be a more appropriate punishment.

93. A three-day suspension is also the Handbook's punishment for a fistfight. (Ex. A at 16.)

94. B.P. met with Quick, who confirmed that I.P. remained suspended.

95. After B.P.'s meetings with Crutchfield and Quick, B.P. handed Quick and Crutchfield a letter demanding they immediately lift I.P.'s suspension pursuant to *Mahanoy* and preserve all relevant documents.

96. On Monday, August 15, 2022, B.P. emailed Quick regarding their August 12 conversation.

97. In the email, B.P. asked Quick, "[w]hat is the specific behavior for which [I.P.] was suspended . . . [and w]hat specific rules worthy of suspension is [I.P.] alleged to have violated?"

98. Quick confirmed that Defendants based I.P.'s suspension on the three Instagram posts depicted in this Complaint and told B.P. that I.P.'s posts violated the Social Media Policy.

## INJURY TO PLAINTIFF

99. Defendants injured I.P. by suspending him for engaging in the protected First Amendment expression of posting nondisruptive images satirizing a school administrator.

100. I.P.'s injuries are ongoing because Defendants' suspension is part of I.P.'s permanent record and will likely impair I.P.'s ability to receive scholarships and gain admission to top colleges and universities because schools assess applicants' academic and disciplinary records.

101. I.P.'s injuries also continue because, but for Defendants' interpretation of the Social Media Policy as prohibiting posting nondisruptive images satirizing school administrators, I.P. would continue to post nondisruptive online content satirizing school officials.

102. I.P. has chilled his speech due to Defendants' actions, the Social Media Policy, and the Wildcat Policy. Since the suspension, and out of fear of further punishment, I.P. has only posted positive content regarding Tullahoma High School

on Instagram. But for Defendants' actions, the Social Media Policy, and the Wildcat Policy, I.P. would have posted additional nondisruptive images on social media criticizing or satirizing school officials.

103.    I.P. and other Tullahoma High School students are in immediate danger of direct injury from the Social Media Policy because they wish to use social media to engage in protected First Amendment expression. I.P. and other students wish to create and post nondisruptive content to social media which may criticize or satirize school officials. I.P. and other students are at risk of discipline for sharing such content, chilling their core protected speech.

104.    I.P. and other Tullahoma High School students are in danger of direct injury from the Wildcat Policy because they wish to use social media to engage in protected First Amendment expression. I.P. and other students wish to create and post nondisruptive expressive content to social media which might be seen as "unbecoming of a Wildcat." I.P. and other students are at risk of discipline for sharing such content, creating a substantial danger of chilling their core protected speech.

<u>**CLAIMS**</u>

**FIRST CLAIM**
**Violation of First Amendment (Damages)**
**Freedom of Speech and Expression**
**42 U.S.C. § 1983**
**(Plaintiff I.P. against Defendants Quick and Crutchfield)**

105.    I.P. re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

106.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or of the right of the people peaceably

to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

107.    The First Amendment protects criticizing public officials. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964).

108.    The First Amendment's protections extend beyond the spoken word to include symbolism and artistic expression. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

109.    The First Amendment therefore protects cartoons and other visual expression satirizing and criticizing government officials. *Hustler*, 485 U.S. at 54.

110.    In *Tinker*, the Court announced a rule that students retain their First Amendment rights in school, but schools may regulate student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others" or that leads school officials to reasonably forecast the same. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513–14 (1969).

111.    Courts are "skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *Mahanoy*, 141 S. Ct. at 2046.

112.    To that end, schools cannot punish students for expression that occurs outside of the schoolhouse, does not disturb the school environment, and is not related to a school-sponsored event. *See Mahanoy*, 141 S. Ct. at 2047–48. *See also Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 207 (3d Cir. 2011) (en banc).

113. School officials likewise cannot punish students for publishing nondisruptive off-campus expression, even if the expression contains vulgarity or sexual innuendo. *Id.* at 219.

114. "Viewpoint discrimination is an egregious form of content discrimination and is presumptively unconstitutional." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (internal quotation omitted).

115. Therefore, in schools, "[t]he prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Tinker*, 393 U.S. at 511.

116. The Supreme Court has squarely held that "giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017).

117. I.P.'s posts are protected First Amendment expression because they satirized a government official and did not create material disruption, cause substantial disorder, or invade the rights of others at school. The posts likewise did not cause Defendants to reasonably forecast such a disruption.

118. Quick and Crutchfield therefore violated I.P.'s First Amendment rights when they suspended I.P. for engaging in nondisruptive off-campus expression by posting three images on Instagram satirizing Quick's overly serious demeanor.

119. Quick and Crutchfield engaged in impermissible viewpoint discrimination by punishing I.P. for posting nondisruptive images satirizing Quick

on the basis that the posts "embarrass[ed], demean[ed], or discredit[ed] the reputation of any student or staff."

120.    Prohibiting students from posting nondisruptive images on social media which "embarrass[], demean[], or discredit[]" a student or staff member is not narrowly tailored because it prohibits all social media expression that may subjectively "embarrass," "demean," or "discredit" a staff member or student, regardless of whether the expression is proscribable under *Tinker*, *Mahanoy*, and their progeny.

121.    There is no legitimate, let alone compelling, state interest in prohibiting students from engaging in nondisruptive speech about school staff or other students outside school hours and away from school property.

122.    Quick's and Crutchfield's actions deprived I.P. of his First Amendment right to engage in nondisruptive expression outside of school.

123.    It is clearly established that criticizing government officials "is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

124.    It is clearly established that "[s]peech does not lose its protected character . . . simply because it may embarrass others." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982).

125.    It is clearly established that the First Amendment protects cartoons and visual satire. *Hustler*, 485 U.S. at 54.

126.   It is clearly established that government actors may not discriminate against speech based on the viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

127.   It is clearly established that the government may not discriminate against speech that causes offense to others because "giving offense is a viewpoint." *Matal*, 582 U.S. at 243.

128.   It is clearly established that the First Amendment protects students' right to engage in speech and expression away from school so long as the expression does not cause material disruption, substantial disorder, invade the rights of others, or cause the school to reasonably forecast the same. *Tinker*, 393 U.S. at 513; *Mahanoy*, 141 S. Ct. at 2046.

129.   By suspending I.P. for I.P.'s protected speech, and discriminating against I.P. based on his viewpoint, Quick and Crutchfield showed reckless and callous indifference to I.P.'s First Amendment rights of which a reasonable official would have known.

130.   As a direct and proximate cause of Quick's and Crutchfield's actions, I.P. was deprived of his rights guaranteed by the First Amendment and suffered damage to his reputation, physical and mental anguish, emotional distress, humiliation, and public embarrassment. I.P. is entitled to actual and compensatory damages against Quick and Crutchfield in an amount to be proven at trial.

131.   As a direct and proximate result of Quick's and Crutchfield's actions, I.P. has suffered and continues to suffer irreparable injury, including being deprived

of his constitutional right to post nondisruptive expressive images on social media and to be free from viewpoint discrimination.

132. The denial of constitutional rights is an irreparable injury per se. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

133. Quick's and Crutchfield's conduct toward I.P. recklessly and callously disregarded and was indifferent to I.P.'s rights because they acted with the intent to suppress I.P.'s nondisruptive expressive images satirizing a school official. Accordingly, punitive damages are appropriate and necessary to punish Quick and Crutchfield for abridging I.P.'s constitutional rights and to deter similar violations in the future.

**SECOND CLAIM**
**First Amendment Retaliation**
**42 U.S.C. § 1983**
**(Plaintiff I.P. against Defendant Quick)**

134. I.P. re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

135. It is well settled that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

136. I.P. engaged in protected First Amendment expression for the reasons stated in Claim I.

137. Quick violated I.P.'s First Amendment rights by suspending I.P. based on the satirical content about Quick which I.P. posted on his Instagram account.

138.    But for I.P.'s protected expression satirizing Quick, Quick would not have suspended I.P.

139.    Suspending a student for posting a nondisruptive satirical image about his school principal on Instagram would deter a person of ordinary firmness from continuing to engage in protected First Amendment activity.

140.    Quick's actions chilled I.P. from engaging in protected First Amendment activity because I.P. has not posted satirical social media content critical of school officials since the suspension.

141.    As a direct and proximate cause of Quick's actions, I.P. was deprived of his rights guaranteed by the First Amendment and suffered damage to his reputation, physical and mental anguish, emotional distress, humiliation, and public embarrassment. I.P. is entitled to actual and compensatory damages against Quick in an amount to be proven at trial.

142.    Quick's conduct toward I.P. recklessly and callously disregarded and was indifferent to I.P.'s rights because he acted with the intent to suppress I.P.'s nondisruptive expressive social media posts satirizing him. Accordingly, punitive damages are appropriate and necessary to punish Quick for abridging I.P.'s constitutional rights and to deter similar violations in the future.

### THIRD CLAIM
### *Monell* Claim for Violation of First Amendment
### 42 U.S.C. § 1983
### (Plaintiff I.P. against Defendant School District)

143.    I.P. re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

144.    I.P. engaged in protected expression for the reasons stated in Claim I.

145.    Quick's and Crutchfield's actions violated I.P.'s constitutional rights for the reasons stated in Claims I and II.

146.    A local governmental entity is considered a person under 42 U.S.C. § 1983 when an employee's act represents an official policy or custom of the government. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

147.    The actions of a single official create liability for a local government where that official has "final policymaking authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

148.    A school official is liable under *Monell* when they have final policymaking authority as determined by state law. *Adkins v. Bd. of Educ. of Magoffin Cnty., Ky.*, 982 F.2d 952, 957 (6th Cir.1993).

149.    The Tullahoma School District only hears appeals for suspensions longer than 10 days. (Tullahoma Board of Education Policy Manual, §§ 6.316 and 6.317; TCA 49-6-3401(a)-(c).)

150.    Because I.P.'s three-day suspension was less than the 10-day minimum necessary to trigger the availability of the School District's appellate review process, Quick was the final policymaker with respect to I.P.'s suspension.

151.    Quick's suspension of I.P. constituted and effectuated the official policy of Tullahoma High School because Quick possessed final policy- and decision-making authority regarding I.P.'s three-day suspension.

152.    In the alternative, if Quick removed himself from the policymaking process with respect to I.P.'s suspension, then Crutchfield was the final policymaker regarding I.P.'s suspension because, as Assistant Principal, he acts with the authority of the principal when the principal is recused.

153.    Because Quick's and Crutchfield's acts constituted the School District's official policy, practice, and custom, the School District is liable for depriving and continuing to deprive I.P. of his constitutional rights under 42 U.S.C. § 1983, pursuant to *Monell*, 436 U.S. 658.

154.    The School District's policy, practice, and custom of punishing I.P. for engaging in nondisruptive, off-campus expression—carried out through Quick and Crutchfield—was the moving force behind Quick's and Crutchfield's infringement of I.P.'s constitutional rights because Quick and Crutchfield acted pursuant to that official policy, practice, and custom.

155.    As a direct and proximate result of the School District's policy, practice, and custom of punishing I.P. for engaging in nondisruptive, off-campus expression, I.P. was and continues to be deprived of his constitutional rights to freedom of expression. As a legal consequence of the School District's violation of I.P.'s First Amendment rights, I.P. is entitled to damages from the School District under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**Violation of First Amendment (Injunctive and Declaratory Relief)**
**Freedom of Speech and Expression**
**42 U.S.C. § 1983**
**(Plaintiff I.P. against Defendant School District)**

156.    I.P. re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

157.    Defendants' actions violated I.P.'s constitutional rights for the reasons stated in Claims I-III.

158.    As explained more fully in Claim I, a school cannot punish a student for expression which does not cause material disruption, substantial disorder, invade the rights of others, or cause a school to reasonably forecast the same.

159.    A school district's attempt to punish off-campus speech is subject to a higher level of scrutiny, since regulating off-campus speech "may mean the student cannot engage in that kind of speech at all." *Mahanoy*, 141 S. Ct. at 2046.

160.    The Social Media Policy prohibits students from posting "unauthorized or misrepresented" photographs which "embarrass[], demean[], or discredit[]  the reputation of any student or staff . . . or results in any action or activity disruptive to the educational process." (Ex. A at 9) (emphasis added).

161.    The Social Media Policy violates the First Amendment because it prohibits students from posting "unauthorized or misrepresented" photographs which "embarrass[], demean[], or discredit[]  the reputation of any student or staff," even if the expression does not cause material disorder, substantial disruption, an invasion of the rights of others, or cause the school to reasonably forecast the same.

162. The First Amendment prohibits banning speech which may offend, embarrass, demean, or discredit another because "giving offense is a viewpoint." *Matal*, 582 U.S. at 243.

163. The Social Media Policy violates the First Amendment because it discriminates based on viewpoint by prohibiting students from posting media which "embarrasses, demeans, or discredits the reputation of any student or staff."

164. I.P. is entitled to a declaration under 28 U.S.C. § 2201 that the Social Media Policy violates the First Amendment.

165. I.P. is entitled to a declaration under 28 U.S.C. § 2201 that the School District's suspension of I.P. based on the Social Media Policy violated the First Amendment, because the Social Media Policy violates the First Amendment both facially and as applied to I.P. I.P. therefore is also entitled to an injunction expunging his suspension which was based on the unconstitutional policy.

166. As a direct and proximate result of the School District's policies and Quick's and Crutchfield's actions, I.P. has suffered and continues to suffer irreparable injury, including being suspended from school and having a major blemish on his record during the college application period, for engaging in protected First Amendment expression. I.P. has also suffered and continues to suffer irreparable harm due to the Social Media Policy's prohibition on protected First Amendment expression, which continues so long as the policy remains in effect.

167. I.P. has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

168.   Without declaratory and injunctive relief against the School District's suspension of I.P. and the Social Media Policy, the School District's suppression of I.P.'s First Amendment expressive rights will continue and I.P. will suffer per se irreparable harm indefinitely.

## FIFTH CLAIM
## Violation of First and Fourteenth Amendments (Injunctive and Declaratory Relief)
## Vagueness
## 42 U.S.C. § 1983
## (Plaintiff I.P. against Defendant School District)

169.   I.P. re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

170.   The First and Fourteenth Amendments to the Constitution prohibit restrictions on speech which fail to provide members of the public fair notice of prohibited conduct.

171.   A government policy is unconstitutionally vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

172.   The School District's Social Media Policy is vague because it fails to provide parents and students sufficient information to know what is restricted or required of them so that they may act accordingly.

173.   The School District's Social Media Policy is vague because it fails to provide sufficient precision and guidance so that those enforcing the policy do not act in an arbitrary or discriminatory way.

174.     The School District's Social Media Policy, which fails to provide parents and students sufficient information to conform conduct to the requirements of the law, chills I.P. and other students from engaging in protected First Amendment speech because students use social media to express themselves and communicate with others but now must self-censor protected expression so as not to violate the Social Media Policy.

175.     The School District's Wildcat Policy is facially vague because it fails to provide parents and students sufficient information to know what is restricted or required of them so that they may act accordingly.

176.     The School District's Wildcat Policy is facially vague because it fails to provide sufficient precision and guidance so that those enforcing the policy do not act in an arbitrary or discriminatory way.

177.     The School District's Wildcat Policy, which fails to provide parents and students sufficient information to conform conduct to the requirements of the law, chills I.P. and other students from engaging in protected First Amendment speech because students use social media to express themselves and communicate with others, but now must self-censor protected expression so as not to violate the Wildcat Policy.

178.     I.P. is entitled to a declaration under 28 U.S.C. § 2201 that the School District's Social Media Policy and Wildcat Policy are unlawfully vague and therefore violate the First and Fourteenth Amendments.

179.    I.P. is entitled to a declaration under 28 U.S.C. § 2201 that the School District's suspension of I.P. based on the Social Media Policy violated the First and Fourteenth Amendments, because the Social Media Policy violates the First and Fourteenth Amendments both facially and as applied to I.P. I.P. therefore is also entitled to an injunction expunging his suspension which was based on the unconstitutional policy.

180.    Without declaratory and injunctive relief against the School District's Social Media Policy and Wildcat Policy, the School District's suppression and chill of I.P.'s freedom of speech will continue and I.P. will suffer per se irreparable harm indefinitely.

## SIXTH CLAIM
### Violation of First Amendment (Injunctive and Declaratory Relief)
### Overbreadth
### 42 U.S.C. § 1983
### (Plaintiff I.P. against Defendant School District)

181.    I.P. re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

182.    The First Amendment to the Constitution prohibits regulations that regulate substantially more speech than the Constitution allows to be regulated.

183.    The School District's Social Media Policy is substantially overbroad because it reaches a significant amount of protected First Amendment speech and expressive conduct—including off-campus speech satirizing a high school principal's overly serious demeanor, speech criticizing a teacher's teaching methods, or visual art caricaturizing school officials—in a manner which does not cause material disruption, substantial disorder, or an invasion of the rights of others.

184. The School District's Social Media Policy reaches a substantial amount of protected First Amendment expression relative to any legitimate sweep.

185. To the extent the School District's Social Media Policy has any constitutionally permissible application in terms of maintaining school discipline, its reach is so broad that it chills a substantial amount of constitutionally protected speech—including, for example, off-campus speech satirizing a high school principal's overly serious demeanor, speech criticizing a teacher's teaching methods, or visual art caricaturizing school officials—in a manner which does not cause material disruption, substantial disorder, or an invasion of the rights of others.

186. The reach of the School District's Social Media Policy serves only to chill I.P. and other students from engaging in the full array of protected First Amendment expression.

187. The School District's Wildcat Policy is substantially overbroad because it reaches a significant amount of protected First Amendment speech and expressive conduct, including, for example, off-campus speech satirizing a high school principal's overly serious demeanor, in a manner which does not cause material disruption, substantial disorder, or an invasion of the rights of others.

188. The School District's Wildcat Policy reaches a substantial amount of protected First Amendment expression relative to any legitimate sweep.

189. To the extent the School District's Wildcat Policy has any constitutionally permissible application in terms of maintaining school discipline, its reach is so broad that it chills a substantial amount of constitutionally protected

speech—including, for example, speech criticizing a teacher's teaching methods, or visual art caricaturizing school officials—in a manner which does not cause material disruption, substantial disorder, or an invasion of the rights of others.

190.   I.P. is entitled to a declaration under 28 U.S.C. § 2201 that the School District's Social Media Policy and Wildcat Policy are substantially and unlawfully overbroad on their face and therefore violate the First Amendment.

191.   I.P. is entitled to a declaration under 28 U.S.C. § 2201 that the School District's suspension of I.P. based on the Social Media Policy violated the First Amendment, because the Social Media Policy violates the First Amendment both facially and as applied to I.P. I.P. therefore is also entitled to an injunction expunging his suspension, which was based on the unconstitutional policy.

192.   Without declaratory and injunctive relief against the School District's Social Media Policy and Wildcat Policy, the School District's suppression and chill of I.P.'s and other students' freedom of speech will continue, and I.P. will suffer per se irreparable harm indefinitely.

## **PRAYER FOR RELIEF**

I.P. respectfully requests this Court enter judgment against Defendants and issue the following relief:

A.   Enter a preliminary and permanent injunction enjoining the School District from enforcing its Social Media Policy and Wildcat Policy;

B.   Declare the School District's Social Media Policy and Wildcat Policy violate the First and Fourteenth Amendments;

C.      Enter a preliminary and permanent injunction expunging I.P.'s August 2022 suspension;

D.      Declare that Defendants' August 2022 suspension of I.P. violated the First and Fourteenth Amendments;

E.      Award I.P. compensatory, nominal, and punitive damages;

F.      Award I.P. his attorneys' fees under 42 U.S.C. § 1988;

G.      Award I.P. his costs; and

H.      Award such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

In compliance with Federal Rule of Civil Procedure 38, I.P. demands a trial by jury on all issues so triable.

Dated: July 19, 2023

/s/ Darrick L. O'Dell
DARRICK L. O'DELL
    (BPR#26883)
SPICER RUDSTROM, PLLC
414 Union St., Ste. 1700
Nashville, TN 37219
dlo@spicerfirm.com

Respectfully Submitted,

CONOR T. FITZPATRICK
    (Mich. Bar No. P78981)*
HARRISON M. ROSENTHAL
    (Penn. Bar No. 332452)*
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St., Ste. 1250
Philadelphia, PA 19106
(215) 717-3473
conor.fitzpatrick@thefire.org
harrison.rosenthal@thefire.org

*Pro Hac Vice* Motions Pending

*Attorneys for Plaintiff*

## VERIFICATION OF I.P.

Pursuant to 28 U.S.C. § 1746, I, I.P., declare as follows:

1.     I am a minor (under 18 years old).

2.     My mother is B.P.

3.     I am a Plaintiff in the present case and a citizen of the United States of America.

4.     I have read the foregoing Verified Complaint for declaratory and injunctive relief.

5.     I have personal knowledge of the factual allegations in paragraphs 2, 8–10, 17, 20–39, 41, 43, 45–46, 48, 52, 56–64, 99–104, and 140, of the Verified Complaint and know them to be true.

6.     I verify under penalty of perjury that the foregoing is true and correct.

Executed on July 13, 2023

_____

I.P.

## VERIFICATION OF B.P.

Pursuant to 28 U.S.C. § 1746, I, B.P., declare as follows:

1.  I am over the age of 18 and competent to testify.

2.  I am the parent of I.P., the minor Plaintiff identified in the foregoing

Verified Complaint, and authorize the filing of this Verified Complaint

3.  I verify under penalty of perjury that the foregoing is true and correct.


Executed on July 13, 2023

BP

B.P.