UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| I.P., a minor, by and through B.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-00026 |
| | ) | Judge Katherine A. Crytzer |
| TULLAHOMA CITY SCHOOLS, a | ) | Magistrate Judge Susan K. Lee |
| political subdivision of the State of Tennessee; | ) | Jury Demanded |
| JASON QUICK, in his individual capacity; | ) | |
| and DERRICK CRUTCHFIELD, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

REPLY BRIEF IN SUPPORT OF
DEFENDANT TULLAHOMA CITY SCHOOLS'
MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

Reply to Plaintiff's Introduction (Response pages 1-2)

Plaintiff states that he was suspended "for three images on I.P.'s personal Instagram lampooning" Principal Jason Quick. Assistant Principal Derrick Crutchfield, who issued the suspension, believed it was justified based upon five (5) images/memes, including the KKK and Hitler memes. Answer of Derrick Crutchfield ("Crutchfield Answer") [Doc. 43], ¶¶66-68.

Plaintiff states that "I.P.'s off-campus posts did not cause any disruption at Tullahoma High School, much less substantial disruption." This is false, as a student complained about Plaintiff's Instagram content targeting Principal Quick, during the school day, resulting in the Principal, two Assistant Principals and the band director investigating a potentially incendiary situation, which investigation confirmed that I.P. had in fact posted/shared the abusive content. Answer of Tullahoma City Schools ("School Answer") [Doc. 44], ¶¶2-5. Substantial additional disruption was reasonably expected to follow. Id., ¶2.

1

## I. Reply to Plaintiff's Standard of Review (Response page 7)

Plaintiff states that the Court's review of the School Defendant's motion for judgment on the pleadings is "focused solely on I.P.'s Amended Complaint" and its allegations. However, a court should not accept as true legal conclusions or unwarranted factual inferences in a complaint. JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581-82 (6th Cir. 2007); Stafford v. Klein, 2022 U.S. Dist. LEXIS 155252, *4 (W.D. Mich. 2022) ("The court need not accept the plaintiff's legal conclusions or unwarranted factual inferences"). When evaluating a motion for a judgment on the pleadings, a court "may consider the defendant's answer, and the factual allegations of the answer are taken as true ... to the extent they have not been denied or do not conflict with the complaint". Digiart, LLC v. Casale, 2022 U.S. Dist. LEXIS 236873, *5-6 (M.D. Fla. 2022).

In his Amended Complaint, Plaintiff admits that he was questioned about the KKK and Hitler memes and he responded that he did not create them. Amended Complaint, ¶¶67-68; Crutchfield Answer, ¶65. He did not deny that they were seen on his Instagram account with the 3 other memes or that they were shared with others via his account. Crutchfield Answer, ¶¶66-68; School Answer, ¶¶67-68. Plaintiff contends that the KKK and Hitler memes are also protected expression. Amended Complaint, ¶141. Therefore, for purposes of the instant motion, the Court may consider that the KKK and Hitler memes were, in fact, seen on Plaintiff's Instagram account on the day a student complained about seeing them on his account. And the Court should disregard the Plaintiff's unwarranted inference that his suspension was not believed to be also justified based upon these KKK/Hitler memes, which inference is based solely on a misinterpreted, after the fact, post-suspension E-mail from Quick to Plaintiff's mother indicating that the evidentiary focus was on the 3 images/memes Plaintiff had admitted to being responsible for appearing on his account. The KKK and Hitler memes were also a basis for the suspension in Crutchfield's mind and he

issued the suspension. This has not been denied in the pleadings, nor does it conflict with the factually-based allegations of the Amended Complaint.

## II. Reply to Plaintiff's Argument that the First Amendment Protects Nondisruptive, Off-Campus Speech/Expression (Response page 8)

The parties agree that the First Amendment protects nondisruptive, off-campus speech/expression. This case, however, involved disruptive expression that was seen during the school day and disrupted two (2) students (one who complained and the other who immediately identified I.P. as the sharer of the memes). This resulted in four (4) school officials having to investigate and stop the memes because they reasonably forecast substantial further disruption would result if they were not stopped.

### A. Reply to Plaintiff's Argument that the First Amendment protects lampooning a high school principal (Response pages 9-11)

The question of whether a student's speech/expression is protected by the First Amendment is a question of law to be determined by the court. See Hewlette-Bullard v. Pocono Mt. Sch. Dist., 522 F. Supp. 3d 78, 93 (M.D. Pa. 2021). To the extent that it might be a mixed question of law and fact, the School Defendant contends that the parties' pleadings and the memes themselves answer this question. The Neko Quick meme which I.P. factually admits posting, and the uncontradicted fact that the KKK and Hitler memes were reported by a student and seen by students and school officials on I.P.'s Instagram account, enable the Court to reach a ruling on the memes not being protected expression under the First Amendment.

This is an important case which will help clarify the boundaries on what types of social media postings by students off campus are protected expression and which are not because they are reasonably believed likely to cause substantial disruption in the school environment. Although the School Defendant's officials may not have known the precise interpretations affordable to each of the memes posted and shared, what they were faced with, in real time, were five (5) memes

3

appearing on I.P.'s Instagram account, which caused a student to report them, some of which were inherently disruptive in nature. The Hitler and KKK burning cross memes, showing Principal Jason Quick present, were literally and figuratively incendiary, especially in the Tullahoma High School environment.

I.P.'s Instagram account had hundreds of followers, including fellow students. The student who reported his abusive content identified another student who immediately knew they appeared on I.P.'s account.

The Neko Quick anime cat meme is inherently sexual in nature, misgendered Principal Quick into a transgendered female, and was a form of sexual targeting. A person does not need to be an expert in femboy anime and its sexual connotations to see that. Four (4) school officials, the Principal, both Assistant Principals and the band director, had to immediately get involved to determine who was sharing these abusive memes and to stop them. They were able to do so quickly, preventing what could have been a very bad situation for the school and local community.

The legal standard applicable here is objective, not subjective. School officials do not have the time or the ability to divine what a student's interpretations of posted/shared memes are. They have to use common sense and their best judgment in evaluating whether the memes have caused and/or are likely to cause school disruption. Objectively, these memes squarely fell into that category. On their face, the memes targeting the Principal were harassing, degrading and humiliating. It was reasonably believed that an effective instructional atmosphere could not be maintained if abusive and disrespectful memes such as this were not curtailed. That was a sound, common sense judgment and the Court should not upset it.

Did Principal Quick and Assistant Principal Crutchfield, who made the suspension decision, have an objectively-supported, reasonable belief that there would be substantial disruption at the school after potential viral spreading of the 5 memes on IP's Instagram account?

4

Under the standards of the recently decided Kutchinski case, the School Defendant maintains, yes. The Sixth Circuit held in that case that a school expression restriction can be justified where a school has "reasonably forecast that the [prohibited expression] 'would cause material and substantial disruption to schoolwork and school discipline.'" Kutchinski, 69 F.4th at 359 (quoting Barr v. Lafon, 538 F.3d 554, 565 (6th Cir. 2008)). As in Kutchinski, because "Principal [Quick] [and Assistant Principal Crutchfield] reasonably believed that disruption would take place, [they were] permitted to take steps to thwart the disruption." 69 F.4th at 360.

If Plaintiff's shared memes are deemed protected, this could open the floodgates to students harassing teachers, principals and school personnel under the guise of satire or lampooning. As of today, the precise scope of schools' authority in the area of off-campus disruptive expression has not been delineated. In Mahanoy Area Sch. Dist. v. B.L., 141 S. Ct. 2038, 210 L. Ed. 2d 403 (2021), the Supreme Court declined to adopt a bright line rule for distinguishing between protected versus unprotected off-campus speech/expression. 141 S.Ct. at 2045. In fact, the Supreme Court emphasized that its holding does "not now set forth a broad, highly general First Amendment rule stating just what counts as 'off campus' speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent ... substantial disruption of learning-related activities or the protection of those who make up a school community." Id. at 2045. Instead, the Court left "for future cases to decide where, when, and how these features mean the speaker's off-campus location will make the critical difference." Id. at 2046.

The Mahanoy Court explicitly listed "several types of off-campus behavior that may call for school regulation" due to a constitutionally valid reason. 141 S.Ct. at 2045. One of those behaviors is implicated here: "serious or severe bullying or harassment targeting particular individuals." Id. The Court left open the possibility that a school may regulate speech/expression that qualifies as "serious or severe bullying or harassment" provided that it caused, or had the

5

potential to cause, substantial disruption to the school environment.  Id. at 2045, 2047-48.  The

Sixth Circuit's Kutchinski decision earlier this year is an important guidepost in that direction.

Another post-Mahanoy case that bears some resemblance to this case is Chen v. Albany

Unified Sch. Dist., 56 F.4th 708 (9th Cir. 2022).  In that case, the Ninth Circuit upheld the

suspension of high school students where their Instagram posts targeted specific individuals and

used offensive images, including of the Ku Klux Klan, that "contribute[d] nothing to the

'marketplace of ideas'".  Id. at 717-18.  The court noted:

> [S]ome of the posts used violent imagery that, even if subjectively intended
> only as immature attempts at malign comedy, would reasonably be viewed
> as alarming, both to the students targeted in such violently-themed posts
> and to the school community more generally.  In particular, combining
> photographs of specific students with images drawing upon the horrific
> legacy of terroristic violence executed by the Klan against Black people
> would understandably be deeply upsetting and intimidating to the targeted
> students.  Cf. Virginia v. Black, 538 U.S. 343, 352-57, 123 S. Ct. 1536, 155
> L. Ed. 2d 535 (2003) (recounting the Klan's long history of terroristic
> violence).

Id. at 718.  In this case, the Principal was memed standing and smiling next to KKK members

burning a cross.  This abusive and targeting post contributed nothing to the marketplace of ideas.

Having this meme seen by Tullahoma High School students during the school day (as it was) posed

a high degree of risk that could have led to the school being seriously disrupted for a time.

Fortunately, the situation did not escalate to that, thanks to the cooperation of other students and

I.P.'s confession that all 5 memes were on his Instagram account, even if, as he maintained, he did

not create the KKK and Hitler memes.

Although it is true that students do not "shed their constitutional rights to freedom of speech

or expression" even "at the schoolhouse gate" (Mahanoy, 141 S. Ct. at 2044 (quoting Tinker, 393

U.S. at 506)), the Supreme Court has also "made clear that courts must apply the First Amendment

'in light of the special characteristics of the school environment.'"  Mahanoy, 141 S. Ct. at 2044

(quoting Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S. Ct. 562, 98 L. Ed. 2d 592 (1988) (internal quotation marks omitted)). As the Court said in Mahanoy, "schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" Mahanoy, 141 S. Ct. at 2045 (quoting Tinker, 393 U.S. at 513). As the Court stated in Tinker, "conduct by the student, in class or out of it, which for any reason -- whether it stems from time, place, or type of behavior -- materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech". Tinker, 393 U.S. at 513. The Supreme Court's reference in Mahanoy to the Tinker standards makes is clear that there are situations when a school may prevent on-campus ramifications of off-campus speech/expression.

The memes on I.P.'s Instagram account targeting Jason Quick, followed and seen by other students, constituted harassment, which Mahanoy specifically identifies as an "off-campus circumstance" in which "[t]he school's regulatory interests remain significant." 141 S. Ct. at 2045. Accord Doe v. Hopkinton Pub. Schs, 19 F.4th 493, 505-06 (1st Cir. 2021) ("The Supreme Court made clear in Mahanoy ... that schools have a significant interest in regulating serious or severe bullying or harassment that invades the rights of others [and] [t]his pedagogical interest remains even in off-campus circumstances"). Quick reasonably felt targeted and harassed by the memes.

Merriam-Webster defines "harass" as "to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct." Harass, Merriam-Webster, https://www.merriam-webster.com/dictionary/harassment (last visited 12/7/2023). Similarly, the Oxford English Dictionary defines harass as "[t]o subject (a person or group) to unwarranted ... speech … causing annoyance, alarm, distress, or intimidation". Harass, Oxford English Dictionary https://www.oed.com/search/dictionary/?scope=Entries&q=harass (last visited 12/7/2023).

7

Changing Jason Quick into Neko Quick, misgendering and/or transgendering him, having him smile as hooded KKK members burn a cross, and having him attend a Nazi event with Adolf Hitler is harassment. These memes were inherently disruptive. That is why a student complained. Another student immediately knew it was I.P. that posted/shared the memes.

The potential for racial tension is an example of what courts have deemed a "substantial disruption." See Barr v. Lafon, 538 F.3d 554, 565-66 (6th Cir. 2008). The KKK and Hitler memes did not have to actually cause disruption. "Tinker does not require disruption to have actually occurred." Lowery v. Euverard, 497 F.3d 584, 593 (6th Cir. 2007). Accord Kutchinski, 69 F.4th at 359.

The inquiry is whether the School reasonably forecast that these memes would cause material and substantial disruption to schoolwork and school discipline. Barr, 538 F.3d at 565; Kutchinski, 69 F.4th at 359 ("we must decide whether Defendants reasonably forecast that the posts from the Instagram account would cause material and substantial disruption to schoolwork and school discipline") (cleaned up). Clearly, this was reasonably believed. The School had to act and act quickly, and it did. The memes seen on I.P.'s account that day potentially created a racially and religiously hostile school environment. See Chen, 56 F.4th at 722 (9th Cir. 2022) (noting that the failure of a school to respond to such events "might have exposed it to potential liability on the theory that it had failed to respond adequately to a racially hostile environment of which it had become aware"); West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1366 (10th Cir. 2000) (holding the display of the Confederate flag may interfere with the rights of students to feel secure). I.P.'s posting/sharing these memes, all involving Principal Quick, was purposely designed to reach the high school community given that it targeted a specific school official and was deliberately and purposefully shared with other high school students on social media, under the now-alleged guise of satire and lampoon. See Bell v. Itawamba Cnty. Sch. Bd.,

8

799 F.3d 379 (5th Cir. 2015) (holding that a school can address speech "intentionally direct[ed] at the school community ..., even when such speech originated, and was disseminated, off-campus without the use of school resources").

The memes' abusive and harassing content are self-evident to an observer. The memes must be viewed objectively (from the standpoint of a reasonable school official), not subjectively (from the standpoint of the meme posting/sharing student). Courts applying Tinker have dismissed First Amendment claims at the pleadings stage where the student's speech/expression was allegedly meant as a joke. For example, in A.S. v. Lincoln County R-III School District, 429 F. Supp. 3d 659 (E.D. Mo. 2019), the court granted a school district judgment on the pleadings under Rule 12(c). The plaintiff posted a doctored picture to Snapchat, making it appear that another student had died and was in a casket. Because it found that the Tinker standard is an objective one, the court held that "A.S.'s after-the-fact characterization that the meme was meant to be a joke is therefore irrelevant." Id. at 670.

Plaintiff cites the Third Circuit's 2011 decision in Layshock v. Hermitage Sch. Dist., 650 F.3d 205 (3rd Cir. 2011) for the proposition that a student can lampoon a school principal under the First Amendment. In that case, the student created a fake profile on MySpace posing as the principal and gave bogus answers to survey questions used in creating a profile. All of the student's answers for the fake profile were based on a theme of "big" because the principal was a large man. In that case, the Third Circuit framed the issue before it as "[whether] a school district can punish a student for expressive conduct that originated outside of the schoolhouse [and] did not disturb the school environment". Id. at 207 (emphasis added). In that case, unlike this one, the school district did not argue "that it could properly punish [the plaintiff] under the Tinker exception for student speech that causes a material and substantial disruption of the school environment". Id. at 214. Layshock has been distinguished on this basis by courts in subsequent

9

cases within the Third Circuit.  See <u>A.N. v. Upper Perkiomen Sch. Dist.</u>, 228 F. Supp. 3d 391, 399 (E.D. Pa. 2017) ("Plaintiff's reliance on <u>Snyder</u> and <u>Layshock</u> are misplaced because here, unlike in <u>Snyder</u> and <u>Layshock</u>, an actual disruption occurred", noting that, in <u>Layshock</u>, "the Third Circuit emphasized that the issue before it was not whether the student's conduct caused a disruption to the school environment, so it did not apply <u>Tinker</u> when it found that a student's off-campus speech was protected").  This issue has since been clarified by the Supreme Court in <u>Mahanoy</u> and two Circuit Courts, in <u>Kutchinski</u> (2023) (targeting and directing sexual and violent images at teachers) and <u>Chen</u> (2022) (KKK images were not protected malign comedy).

In the Sixth Circuit, the relevant authority is <u>Kutchinski</u>.  In this case, there was actual disruption in the form a student complaining about Plaintiff's violent and abusive posts and the School's top officials having to quickly respond to that complaint.  The Sixth Circuit rejected the plaintiff's claim in <u>Kutchinski</u> that "Principal Smith's investigation of the Instagram account during the school day caused the disruption."  69 F.4th at 360.  The court found that "because Principal Smith reasonably believed that disruption would take place, she was permitted to take steps to thwart the disruption."  <u>Id</u>.  Tullahoma High School officials are provided "a high degree of deference in the exercise of their professional judgment", lest a court "substitute their own notions of sound educational policy for those of the school authorities which they review."  <u>Id</u>.

Not only was there actual disruption, there was a forecast and reasonable belief of further disruption if the abusive and hostile memes were not stopped.  The rationale for a reasonable belief standard "lies in the fact that requiring evidence of disruption caused by the banned speech would place 'school officials ... between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation.'"  <u>Kutchinski</u>, 69 F.4th at 359 (quoting <u>Lowery</u>, 497 F.3d at 596) ("Defendants reasonably forecasted that a fake Instagram account that

... directed sexual and violent posts at three Freeland teachers and a student would substantially disrupt normal school proceedings").

In recent years, public schools have become more stressed environments, including due to the widespread use of social media. Teachers and administrators are quitting in large numbers. Students are leaving public schools to private schools and home schools. In a 2022 Gallup Poll, teaching was the top profession for burnout in the United States.[1] In a 2022 poll by the National Education Association, 55% of teachers responded that they plan to quit their current education roles earlier than they originally intended.[2] Social media is making it even worse.[3] "The everyday cost includes diverting school resources away from educating students and into increasing disciplinary services and personnel to handle the 'explosion of bullying and harassment incidents' that happen on social media." Id. Harassment and targeting is not limited to students, as shown in Kutchinski and this case. The question to be asked is, why would school teachers and officials want to stay in an environment where they are overworked, underpaid, subjected to violence and now increased distraction and humiliation due to targeting social media abuse?

Plaintiff places much emphasis on Jason Quick's response to his parent's inquiry as to why he was suspended. What Principal Quick actually stated was that "The focus of the concern was on images being created by [I.P.] to which he admitted to three of those presented and housed on his Instagram Page." That was not a statement that the KKK and Hitler memes were not also a justified basis to suspend I.P. Crutchfield participated in the suspension decision and believed it

---

[1]https://www.weareteachers.com/teacher-shortage-statistics/

[2]https://www.nea.org/nea-today/all-news-articles/survey-alarming-number-educators-may-soon-leave-profession

[3]How social media in the classroom is burning teachers out, published September 16, 2023. https://mashable.com/article/teacher-burnout-social-media-in-the-classroom

11

justified based on the KKK/Hitler memes appearing on IP's Instagram account, based on Crutchfield's reasonable concern for additional disruption if it was not stopped. Quick's later statement that what IP admitted to doing was his evidentiary focus does not alter the actual motivation behind Crutchfield's decision. Crutchfield was influenced mostly by the Hitler and KKK memes on I.P.'s account in deciding that a suspension was appropriate.

If the memes shared by I.P. in this case are deemed protected expression, public schools can be turned into meme battlegrounds, with memes targeting teachers and students. With the increasing usage of artificial intelligence (AI) and generative AI, which can and will be used to create memes, the federal courts will likely be flooded with cases similar to this one, having to sit as arbiters of what memes pass constitutionally-protected muster and which do not. Plaintiffs' attorneys will be incentivized to bring such cases, given the potential for large attorney's fees.

If the legal boundaries are not sufficiently protective of school administrators, teachers and students, more of them will exit the public school system, leaving matters even worse for those students and families who have no other options. This is not a case with students wearing armbands to express their political opposition to the Vietnam War (Tinker). That deserves First Amendment protection. This is a case with Hitler salutes, burning crosses and targeted, sexualized misgendering.

The School Defendant submits that there needs to be balance. The balance here was that a 3-day suspension (since removed) was warranted, given the abusive content of multiple memes seen on IP's phone the day that he was suspended.

B.      **Reply to Plaintiff's argument that Defendants' motions impermissibly rely on their own version of events, which still do not show substantial disruption (Response pages 12-13)**

The School Defendant's motion is predicated upon facts alleged by Plaintiff, the memes that he admits sharing, the memes that were also seen on his Instagram account which he denied

12

creating, and the Defendants' factual averments in their answers, which were not controverted by anything other than legal conclusions that the memes were not disruptive. The memes that I.P. posted/shared on his Instagram account (1) were seen in school during the school day (undenied), (2) caused another student to complain about them (undenied), and (3) resulted in immediate investigation and addressing (undenied). This shows the memes were disruptive and Plaintiff's legal conclusions in his Amended Complaint that they were not disruptive need not and should not be accepted by the Court. And it can be inferred from their content that the KKK and Hitler memes were reasonably expected to cause disruption.

Plaintiff cites Cl G ex rel. C.G. v. Siegfried, 38 F.4th 1270, 1278–79 (10th Cir. 2022) for the proposition that multiple parents bringing a student's anti-Semitic social media posts to the principal's attention did not constitute a "substantial disruption" because the principal failed to "substantiate his feeling that the learning environment had been impacted." Response at 13. The Siegfried case was distinguished by the U.S. District Court in the Kutchinski case (which was later affirmed by the Sixth Circuit) as follows:

> Kutchinksi also directs the Court to the recently decided Tenth Circuit opinion: C1.G on behalf of C.G. v. Siegfried, 38 F.4th 1270 (10th Cir. 2022). However, the reasoning in Siegfried does not help him. In Siegfried, a student was off-campus at a thrift store with friends, and he found a hat that 'resembled a foreign military hat from the World War II period.' Id. at 1274. Then the student took a picture of his friends wearing a collection of hats and wigs, including the WWII hat. Id. The student posted the picture to his private Snapchat story with the caption, "Me and the boys bout [sic] to exterminate the Jews." Id. The student removed the post after a few hours and apologized for the picture saying, "it was meant [sic] to be a joke." Id. The school eventually expelled the student for the post. Id. at 1275. The Tenth Circuit held that the plaintiff had properly alleged that the school violated his First Amendment rights... Id. at 1279. In determining that there was no reasonable forecast of substantial disruption under Tinker, the Tenth Circuit specifically reasoned, "C.G.'s post did not include weapons, specific threats, or speech directed toward the school or its students." Id. The Tenth Circuit distinguished the plaintiff's speech from other cases where courts found a substantial disruption under Tinker, and it

13

noted that "those cases all addressed specific threats directed at a school, its students, or its officials." Id.

Here, the Instagram account specifically targeted three teachers and another student.  The Instagram account ... contained real pictures of Mr. Schmidt, Mr. Schmidt's wife and children, Mrs. Howson, Mr. Anderson, and other students.

Kutchinski v. Freeland Cmty. Sch. Dist., 2022 U.S. Dist. LEXIS 138912, *32-35 (E.D. Mich. 2022), aff'd 2023 U.S. App. LEXIS 13687 (6th Cir. June 2, 2023).

In this case, I.P.'s Instagram account targeted Principal Quick, using three (3) real pictures of him as a misgendered femboy, a smiling spectator as a cross is burned by hooded KKK members, and an attendee at a Nazi event with Adolf Hitler giving a Seig Heil salute.  Tullahoma High School officials were reasonably alarmed at these targeting memes on I.P.'s Instagram account, viewed by other students at school, and they reasonably forecast substantial disruption could result from them.  These memes were reasonably forecast to create substantial disruption and make it difficult for the principal to do his job.

C.    **Reply to Plaintiff's argument that Defendants' impermissible post hoc justifications for censoring I.P., even if they made sense, must be ignored (Response pages 14-18)**

Even if the anime cat meme transforming Jason Quick into "Neko Quick" is considered in isolation, standing alone, that meme was sexualized targeting, humiliating, degrading and embarrassing to the school principal.  Plaintiff's counsel has found cartoon show images from 1961 and 2001 of well-known male kids' characters wearing a dress.  People watch The Flintstones and SpongeBob SquarePants expecting to be entertained.  They are comedy cartoon shows with children the main intended audience.  Plaintiff did not post Fred Flintstone or SpongeBob wearing a dress on his Instagram account.  Had he done so, that would have been protected.  That is a well-known cartoon series with an ongoing storyline.  Instead, I.P. posted Principal Quick (a real person) as a femboy maid, which is a specific genre of anime/manga.

14

Things have changed in the last 50 and 20 years. Because Plaintiff seeks to compare the Neko Quick meme that he posted on Instagram to Fred Flintstone and SpongeBob, it has become appropriate to consider a much more plausible meaning of that meme than the one he has offered. The Neko Quick meme strongly appears to be of a femboy. Intentionally or not, I.P. injected the femboy genre into Tullahoma High School in June 2022 and now it needs to be elucidated upon in the context of this case.

> WHO USES FEMBOY?
> As noted, femboy is used as slang in speech and writing in a range of settings. It can insult men perceived as too effeminate. It can label a genre of pornography featuring slender, curvy, often cross-dressing men. It can also be a self-identifying form of gender expression in the LGBTQ community. <u>Be mindful of context and audience when using</u> or interpreting <u>femboy</u>.

https://www.dictionary.com/e/gender-sexuality/femboy/ (emphasis added). Here, I.P.'s audience was the students, teachers and officials of Tullahoma High School. The Neko Quick meme appeared and was seen by students and school officials on Plaintiff's sexualized Instagram account, which bore a sexual screen name and had account descriptions including, "I'm colorblind what's the bi flag," and "You have nothing to lose but your cock and balls." Answer of Jason Quick, Ex. 1 [sealed Doc. 48 at page 2].

The Neko Quick meme could have reasonably been interpreted by school officials as a form of targeted harassment of Principal Quick. A Google search of search of "Neko anime femboy" retrieves many images showing males with cat features wearing dresses, as in the Neko Quick meme. The femboy genre has a Reddit page, r/femboymemes, with many images similar to the Neko Quick meme: https://www.reddit.com/r/femboymemes/. The femboy genre also has an Instagram hashtag, #femboymaid, with more than 1,000 posts, including images similar to the Neko Quick meme. Five examples of such images on social media (juxtaposed with the Neko Quick meme) follow:

15



1st image: https://aesthetics.fandom.com/wiki/Maid?file=Maidcore5.jpg
2nd image: https://www.deviantart.com/maxperrymancosplay/art/Femboy-French-Maid-1-865247476
3rd image: https://knowyourmeme.com/photos/2479051-big-ed
4th image: https://www.reddit.com/r/femboymemes/comments/18bdr2q/can_i_pat_u_3/
5th image: Neko Quick, posted by I.P. on Instagram, seen in school during the school day
6th image: https://www.deviantart.com/dexthespoonyone/art/Catboy-Maid-844530799

The Neko Quick meme misgendered Jason Quick. Misgendering can be considered a form of targeted harassment. The Neko Quick meme is not a Fred Flintstone or SpongeBob meme. The Neko Quick femboy meme, posted by Plaintiff on Instagram, could reasonably be deemed to have created a hostile environment for the targeted individual, the school Principal, who was reasonably offended and embarrassed, even if its full meaning was not realized at the time.

Even if I.P. is being truthful about the meaning he ascribed to the Neko Quick meme, this is not the legal test. Under First Amendment legal standards, a meme is viewed objectively in the eye of the beholder, not in the eye of the creator. Under <u>Kutchinski</u>, it is what school officials reasonably saw and thought when they observed these memes, after they resulted in a student complaint, that matters. By misgendering the school principal, the Neko Quick meme was inherently disruptive as a form of targeted harassment. It was a sufficient basis to suspend I.P. on its own.

### D. **Reply to Plaintiff's argument that even if I.P.'s posts carried the meaning Defendants now claim they do, they remain protected First Amendment expression (Response pages 18-21)**

Plaintiff's argument that the School Defendant cannot show a legal basis to limit expression in the school environment that is not obscene or constitute fighting words is mistaken. Those are categories that the Supreme Court has allowed schools to regulate. <u>Mahanoy</u>, 141 S.Ct. at 2045-46. They are not the only categories, however. A school may limit expression that substantially disrupts the learning environment, even if it is not obscene or fighting words. <u>Id</u>. at 2044-45 ("[C]onduct by [a] student, in class or out of it, which for any reason ... materially disrupts classwork or involves substantial disorder or invasion of the rights of others is ... not immunized by the constitutional guarantee of freedom of speech") (quoting <u>Tinker</u>, 393 U.S. at 513). That is the category of expression at issue in this case. <u>Kutchinski</u>, 69 F.4th at 356-57.

Plaintiff again cites <u>Layshock</u>, an obscenity/epithet exception case. As noted <u>supra</u>, the Third Circuit's 2011 <u>Layshock</u> is distinguishable from this case because the court stated that the issue before it was not whether a student's conduct caused a disruption to the school environment, so it did not apply <u>Tinker</u> standards.

Plaintiff cites another 2011 Third Circuit case, <u>J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.</u>, 650 F.3d 915 (3d Cir. 2011). That case also involved the obscenity exception. The student

17

plaintiff created a sexually vulgar parody Myspace profile of her school principal. The only disruption cited by the school district in that case was a counselor having to reschedule student appointments to attend a meeting with the plaintiff and her parents. In this case, there was also a meeting with Plaintiff's parents, but the School is not arguing that this meeting was disruptive. In this case, there was a student complaint and 4 school officials needing to address, not only the "satire" memes, but also the KKK and Hitler memes, which appeared to portray Principal Quick as a racist, at a time when there were already accusations of racial bias by Quick. The J.S. case, involving an obvious parody account with obscenity, did not involve racial memes and a racial environment that could blow up if the memes were not stopped. Memes can be more powerful and disruptive than words. The Kutchinski (6th Circuit) and Chen (9th Circuit) cases, both decided after Mahanoy, involved targeting and are more on point with this case.

Plaintiff contends that the Defendants' pleadings did not show substantial disruption or forecast substantial disruption. To the contrary, see Defendant Quick's answer [Doc. 42] (¶¶8-9) PageID #: 331; Defendant Crutchfield's answer [Doc. 43] (¶¶3-6) PageID #: 364-65; and the School Defendant's answer to the amended complaint [Doc. 44] (¶¶2-4) PageID #: 368-70.

Defendants made factual averments in their answers, based on what they saw, heard, learned and addressed first-hand. These factual statements were not denied with facts by Plaintiff, whose amended complaint just offers the opinion and conclusion that there was no disruption. Such legal conclusions should be disregarded for purposes of a Rule 12(c) motion. See Dominion Energy Cove Point Lng, L.P. v. Energy, 2020 U.S. Dist. LEXIS 253335, *18 (E.D. Va. 2020) (for purpose of a Rule 12(c) motion, the court disregards a party's legal conclusions).

18

**III.** **Reply to Plaintiff's Argument that Defendants Violated I.P.'s Due Process Rights by Allowing Quick, the Object of I.P.'s Satire, to Involve Himself in the Suspension Decision (Response page 21-22)**

Plaintiff has not shown he was denied procedural due process under <u>Goss</u> principles for the removed 3-day suspension. Due process requirements were met as, during "an informal give-and-take between student and disciplinarian," he was "told what he [was] accused of doing and what the basis of the accusation [was]" and then given an opportunity to respond. <u>C.Y. v. Lakeview Pub. Schs.</u>, 557 Fed. App'x. 426, 430 (6th Cir. 2014); <u>Buchanan v. City of Bolivar</u>, 99 F.3d 1352, 1359 (6th Cir. 1996) ("once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands").

**A.** **Reply to Plaintiff's Argument that because I.P.'s posts lampooned Quick, involving Quick in the decision to suspend I.P. violated the Due Process Clause (Response pages 22-24)**

Assistant Principal Crutchfield participated in the investigation, received information about what happened, agreed with the decision to suspend I.P. and issued the suspension. He was not a target of or subject of any of the 5 memes. There is no allegation or reason to believe that he was biased against I.P. Had Quick not participated, Crutchfield would still have issued the suspension. Crutchfield Answer [Doc. 43] ¶5, PageID #: 337 ("the decision to suspend IP included a meeting in which this Defendant [Crutchfield], Plaintiff IP, Defendant principal Quick, and, band director Jason Scott participated, followed by another meeting in which this Defendant [Crutchfield], Plaintiff IP and band director Jason Scott also participated"), ¶6 ("the suspension was reasonable in light of the circumstances [and] all actions were reasonably taken intending to promote a school environment free of bullying, denigration, harassment, discrimination, intimidation and disruption"); ¶120, PageID #: 349 ("This Defendant denies that he injured Plaintiff by suspending him and such suspension, in light of all the relevant facts and circumstances, was warranted").

19

In the Heyne case cited by Plaintiff, the plaintiff in that case credibly alleged that all three decisionmakers (Manuel, Perry and Jones) had bias and suspended him because of his race. 655 F.3d at 571-72. In Heyne, the court noted that there was evidence that all of the decisionmakers in that case may have been partial (rather than impartial) because the school was under pressure to have less racially-disparate discipline statistics and the plaintiff was white, calling into question the impartiality of the entire disciplinary decision-making process. As a result, determining the "appropriate discipline in relation to the September 5, 2008 incident had been manifestly compromised". Id. at 568-69. There is no reason to believe that the investigation of I.P.'s admitted sharing of memes was compromised by a need to suspend someone.

The Heyne court also noted that courts have found in other cases that the fact that a school principal or official witnessed an incident does not preclude their participation in the disciplinary process, even if they had been injured or sued by the student:

> The Supreme Court has implied that due process does not necessarily bar a school official who witnesses student misconduct from deciding to suspend the student. See Goss, 419 U.S. at 584 (stating that a school official who witnesses student misconduct may suspend the student so long as "an informal give-and-take" occurs between the student and the school official); Schaill by Kross v. Tippecanoe Cnty. Sch. Corp., 864 F.2d 1309, 1324 (7th Cir. 1988) (stating that "we note that the Supreme Court in Goss specifically contemplated that a school official with personal knowledge of the grounds for discipline might serve as the hearing officer, consistent with the requirements of due process[.]"). The Eleventh Circuit has stated that "[i]n the school context, it is both impossible and undesirable for administrators involved in incidents of misbehavior always to be precluded from acting as decisionmakers" and has concluded as a matter of law that no violation of a student's procedural due process rights occurred when a student had injured the principal who decided to suspend her. See C.B. by Breeding, 82 F.3d at 385, 387 n.3.

Id. at 567-68.

**B.** **Reply to Plaintiff's Argument that I.P.'s equitable due process claim should not be dismissed because the School District cannot prove at the 12(b)(6) stage it would have suspended I.P. without Quick's involvement (Response pages 24-26)**

20

Plaintiff did not address in his opposition the requirement that, to sustain a procedural due process claim, a plaintiff must not only show faulty procedure (which did not exist here), but also prejudice in the form of a different outcome, had due process been provided. The potential merits of a procedural due process claim are not examined without a demonstration of prejudice. Graham v. Mukasey, 519 F.3d 546, 549 (6th Cir. 2008). In order to establish prejudice, Plaintiff "must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations." Id.

Plaintiff suggests that his admission of posting/sharing the memes does not affect his procedural due process claim because his conduct involved expression. He mistakenly states "each case [cited by the School] involved conduct without an underlying speech component." Opposition at 25. That is not true. Kowalski v. Berkeley County Schools, 652 F. 3d 565 (4th Cir. 2011) involved a school student who created an online discussion group targeting another student. The Sixth Circuit approvingly cited Kowalski in Kutchinski for its upholding the suspension of a student "who created a MySpace page to bully another student and subsequently commented on friends' posts which made derogatory comments about the student". 69 F.4th at 358. In Kowalski, the student admitted creating the group on which the content, including photographs, was posted. 652 F.3d at 568. The vice principal called Kowalski into her office, informed her of the harassment and bullying charge, discussed the group on which the content was shared with her, and, after Kowalski acknowledged her role, imposed a 10-day suspension. Id. at 576. The court granted the school judgment on plaintiff's procedural due process claim, finding that, "Because Kowalski admitted her conduct, the administrators were not required to provide a more extensive opportunity to allow her to justify her conduct." Id.

C.   **Reply to Plaintiff's Argument that because procedural due process rights are "absolute," I.P.'s due process damages claim survives even if the School District would have suspended I.P. without Quick's involvement  (Response pages 26-27)**

Although nominal damages may be available in a case where procedural due process was denied, it was not denied in this case.  Plaintiff admitted to sharing/posting the memes, and he cannot show any prejudice.  In the absence of a violation, there is no basis for nominal damages.

D.   **Reply to Plaintiff's Argument that Defendants cannot use post hoc rationales to justify I.P.'s suspension   (Response page 27)**

The School Defendant constitutionally justifies the now removed suspension on the basis of actual disruption of the school environment and the reasonable belief of further disruption if the abusive and hostile environment-creating memes were not stopped.  That is what the Defendants' answers and motions have contended at all points in this litigation.  This disruption legal terminology was not required to be shared on the day of the event.

IV.   **Reply to Plaintiff's Argument that the School District Has Not Permanently Expunged I.P.'s Suspension or Irrevocably Removed the Social Media and Wildcat Policies, so I.P.'s Equitable Claims Remain Live (Response pages 33-34)**

Plaintiff argues that his claims for injunctive and declaratory relief against the School (5th, 6th and 7th Claims,) based upon his removed suspension and removed policies, are not moot. Those claims are now demonstrably moot, however, and the Court no longer has subject matter jurisdiction over them.

A.   **Reply to Plaintiff's Argument that Because the School District has not permanently expunged I.P.'s suspension, Claims V–VIII [sic] [should be V-VII] remain live (Response pages 34-36)**

Plaintiff contends that his suspension is not permanently expunged.  However, the suspension was removed, no longer exists and is not coming back.

On July 18, 2023, Plaintiff filed a Motion for Preliminary Injunction against the School Defendant seeking an order removing his August 2022 suspension from his student record during

22

the pendency of the litigation [Doc. 4]. On August 14, 2023, the parties filed a Stipulation [Doc. 25] reflecting that "Tullahoma City Schools agrees to make a correction to I.P.'s student record, to remove I.P.'s 3-day out of school suspension that was assessed 8/10/22". PageID #: 145. Following that removal, "Tullahoma City Schools confirms that, following the correction to I.P.'s records, <u>there exists no August 2022 suspension on I.P.'s school record</u>." <u>Id</u> (emphasis added).

The definition of "expunge" is "to strike or blot out; erase"[4] and to "remove information from a piece of writing."[5] I.P.'s suspension is expunged. It was erased and removed.

Moreover, the former suspension is permanently expunged and removed. The Direct of Schools has stated under oath that "Plaintiff will not be suspended again for his involvement with the 5 images/memes at issue in this suit." Doc. 53-1, PageID #: 476. There is no basis for any Court involvement, as the former suspension is now permanently expunged and removed.

### B. Reply to Plaintiff's Argument that I.P.'s challenges to the Social Media Policy and Wildcat Policy remain live (Response pages 36-40)

In this action, Plaintiff sought/seeks an injunction against the School Defendant enjoining enforcement of the now removed Social Media and Wildcat policies. Docs. 4, 36 (prayers for relief), PageID #: 275. Both of those policies were removed the same day this case was filed, July 19, 2023. Plaintiff contends that the School District's removal of the policies on day 1 of this case and the Director of School's declaration under oath that the policies will not be reinstated during Plaintiff's remaining time as a student at the School are "insufficient."

There is nothing more that could be done to have these policies not apply to Plaintiff than to remove them and promise they will not return. Dr. Stephens' declaration states that the removal

---

[4]https://www.dictionary.com/browse/expunge

[5]https://dictionary.cambridge.org/us/english/expunge

of these policies on July 19 "was at the direction of the School's legal counsel" and "The School will not reinstate either policy during this academic year."  Doc. 53-1, PageID #: 475.  That is legally sufficient to render the claims predicated on these policies moot.

The <u>Schlissel</u> decision is distinguishable from this case for the reasons stated in the School Defendant's initial brief at pp. 15-17, PageID #: 464-66.  The case that is on point is <u>Thomas v. City of Memphis</u>, 996 F.3d 318 (6th Cir. 2021).  Under <u>Thomas</u>, Dr. Stephens' declaration is afforded great weight on the issue of whether an allegedly wrongful policy is likely to recur.  <u>Id</u>. at 326 (noting the significance of a government official signing a declaration under penalty of perjury stating that a challenged policy would not resume).  As in <u>Thomas</u>, the School's permanent removal of these policies for the remainder of Plaintiff's time as a student "has completely and irrevocably eradicated the effects of the alleged violation".  <u>Id</u>. at 329.

## Conclusion

All four Tullahoma High School officials who saw the memes I.P. shared did not see them as satire.  They saw them as targeting and abusive.  That was an objectively reasonable interpretation for them to make.  What I.P. intended is not controlling, what the school officials reasonably believed is.

If memes like those posted on I.P.'s Instagram account are found to be legally protected expression, it will be open game for public school students to misgender their school principals, teachers and other students when they are unhappy with them for some reason, setting off a cascade of school disruption and school officials afraid to take corrective action, lest they get sued personally for violating students' First Amendment rights.  The Court should defer to the School's reasoned decision in this case or school officials will be more reluctant to protect their schools from abusive, disruptive social media posts targeting them or others.

24

Respectfully submitted this 11th day of December, 2023.

/s/ Jerome D. Pinn
Kenneth S. Williams (#010678)
Jerome D. Pinn (#017848)
**Wimberly Lawson Wright Daves & Jones, PLLC**
P.O. Box 655
1420 Neal Street, Suite 201
Cookeville, TN 38503-0655
Telephone (931) 372-9123
kwilliams@wimberlylawson.com
jpinn@wimberlylawson.com

*Attorneys for Defendant Tullahoma City Schools*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served, via the Court's ECF system, U.S. Postal Service, postage prepaid, and/or via facsimile or by email, a true and correct copy of the foregoing pleading upon counsel for all parties, as follows:

| | |
|---|---|
| Darrick L. O'Dell | Conor T. Fitzpatrick |
| Spicer Rudstrom, PLLC | Jeffrey D. Zeman |
| 414 Union St., Ste. 1700 | Foundation for Individual Rights and Expression |
| Nashville, TN 37219 | 510 Walnut St., Ste. 1250 |
| | Philadelphia, PA 19106 |
| | |
| W. Carl Spining | Alix C. Michel |
| Mickey Schmitt | David Ward |
| Ortale Kelley Law Firm | Michel & Ward |
| 330 Commerce St., Ste. 110 | 735 Broad St., Ste. 406 |
| Nashville, TN 37201 | Chattanooga, TN 37402 |

/s/ Jerome D. Pinn          12/11/2023
Attorney                  Dated