T24-0250

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## WINCHESTER DIVISION

| | | |
|---|---|---|
| **I.P., a minor, by and through B.P.,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **No. 4:23-cv-00026** |
| | ) | |
| **TULLAHOMA CITY SCHOOLS, a** | ) | |
| **political subdivision of the State of** | ) | |
| **Tennessee;** | ) | |
| | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Tullahoma City Schools, by and through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, would submit unto the Court the following memorandum of law in support of its motion for summary judgment:

### I.     FACTS

Plaintiff I.P. is a former student at Tullahoma High School ("THS") that graduated from THS in May 2024. (Depo. I.P. ppg. 15:9 – 23; 25:17 – 18).  During the relevant time period of the instant action, Jason Quick ("Mr. Quick") was the principal of THS. (Depo. J. Quick ppg. 31:11 – 14; 33:21 – 23).  Derrick Crutchfield ("Mr. Crutchfield") and Renee Flowers ("Dr. Flowers") were also assistant principals of THS during the relevant time frame of this action. (Depo. D. Crutchfield pg. 12:13 – 19) (Depo. R. Flowers pg. 12:2 – 8).  Assistant Principals at THS are given significant

discretion in conducting investigations into student misconduct allegations and determining the appropriate disciplinary actions for the student(s) involved. (Depo. J. Quick ppg. 47:9 – 49:16) (Depo. D. Crutchfield pg. 23:11 – 21). The Defendant's Board of Education policy and the student handbook are referenced to determine appropriate student disciplinary actions. (Depo. R. Flowers pg. 23:20 – 23). The Plaintiff was disciplined during his sophomore year in an incident where he was in a group text with some of his band mates and targeted a former band member, who was still in the group text, with a barrage of insults and other bullying behavior, resulting in an in-school suspension. (Depo. I.P. ppg. 27:4 – 34:6).

During 2022, Plaintiff posted three images of Mr. Quick to his Instagram account. (Depo. I.P. Ex. 3 – 5). The first image portrays Mr. Quick in an apron with cat ears, whiskers, a star on his nose, a heart filter with sparkles, and the captions "Nya!" and "Neko Quick." (Depo. I.P. pg. 59:17 – 23). According to Plaintiff, "Neko" means a person with cat-like features and "Nya" is the sound a cat makes. (Depo. I.P. ppg. 59:17 – 23; 61:9 – 13). Plaintiff admits that he posted this image in order to portray Mr. Quick in a feminine light. (Depo. I.P. pg. 61:14 – 19). Mr. Quick was disappointed by this image of him because he felt no male should be portrayed in such a feminine way, especially as the principal in charge of THS with the responsibility of ensuring that everyone gets along and doesn't bully each other. (Depo. J. Quick ppg. 69:17 – 71:9). Mr. Quick also found the cat ears and whiskers objectionable because of the connotation of "furries." (Depo. J. Quick ppg. 72:18 – 73:1). Mr. Quick interpreted the hearts surrounding him in the image as a portrayal of him with sexual and romantic overtones when combined with the furry cat features and wearing an apron. (Depo. J. Quick ppg. 74:9 – 19; 75:21 – 76:8).

Mr. Crutchfield was concerned about the Neko Quick meme causing a disruption to THS's school activities because portraying Mr. Quick in such a way could endanger others' perception of him as a respected administrator in the THS community. (Depo. D. Crutchfield ppg. 44:25 – 45:12). Mr. Crutchfield was concerned that the Neko Quick meme would cause a substantial disruption to the educational process of the school because THS had a male student that would wear skirts to school every day and Mr. Crutchfield believed that this student would perceive the meme as Mr. Quick making fun of him. (Depo. D. Crutchfield pg. 42:5 – 24). The second image shows Mr. Quick holding a box of vegetables with googly eyes and the captions "my brotha" in between two fire emojis, "on god," and "like a sister but not a sister." (Depo. I.P. ppg. 63;3 – 12; Ex. 4). Plaintiff admitted to adding the captions "on god" and "like a sister but not a sister" to this image. (Depo. I.P. ppg. 64:11 – 20; 65:3 – 14). Mr. Quick found this image of him objectionable because the term "on god" was disrespectful and blasphemous and the terms "brotha" and "sister" have racial overtones that are inappropriate. (Depo. J. Quick pg. 66:1 – 13).

When asked why he did not like Mr. Quick, Plaintiff perceived Mr. Quick to have ignored a question of his at a school assembly regarding a THS dress code policy. (Depo. I.P. ppg. 39:15 – 41:20). Plaintiff also stated that he did not like Mr. Quick because of an incident where he allegedly "berated" Plaintiff for being disrespectful toward a substitute teacher, although this "substitute" teacher was actually the Head of the Math Department at THS. (Depo. I.P. ppg. 41:21 – 43:19). Likewise relevant is the fact that racial tensions were brewing at THS leading up to the August 10, 2022 incident with the Plaintiff as a result of many students' perception of the THS dress code policy being racially discriminatory and an allegation of Mr. Quick using a racial slur toward a black

student. (Depo. I.P. ppg. 40:8 – 41:13; 50:4 – 51:23). The third image Plaintiff admitted to posting to his Instagram page shows Mr. Quick's head pasted onto a poorly drawn body of a character from the video game "Among Us," and a bird character named Mordecai from "Regular Show," an animated television series. (Depo. I.P. Ex. 5). Given the context of the other images Mr. Quick had seen, Mr. Quick perceived this image to portray him in a negative and sexualized light. (Depo. J. Quick pg. 88:9 – 24).

Two other images, one of Mr. Quick with Ku Klux Klan members and the caption "pablo" and the other with Mr. Quick next to Adolf Hitler, had also circulated on social media among the THS student body. (Depo. I.P. ppg. 54:19 – 55:11; 57:20 – 58:25; Ex. 1; Ex. 2). Mr. Quick was extremely disturbed by the KKK meme of him because he had tried to ensure an environment of racial sensitivity and inclusivity at THS, and the portrayal of him in such a racist light would likely cause racial division at THS he wanted to avoid. (Depo. J. Quick ppg. 109:25 – 111:8; 121:8 – 122:5). Mr. Crutchfield was deeply concerned with the impact of the KKK meme on Mr. Quick's reputation as a respectable authority figure to students, parents and teachers in the Tullahoma community, especially with its diverse population. (Depo. D. Crutchfield ppg. 52:25 – 53:7). Mr. Quick was also very disturbed by the Hitler meme of him because of the racially divisive connotation of that image, particularly with a portion of the THS student body being Jewish. (Depo. J. Quick ppg. 128:6 – 129:12). Mr. Crutchfield expressed the same concerns about Mr. Quick's perception as a respectable authority figure in the Tullahoma community when he saw the Hitler meme of Mr. Quick. (Depo. D. Crutchfield ppg. 56:17 – 57:1).

On August 10, 2022, Mr. Quick was made aware of the Hitler and KKK images when a THS student, A.L., frantically came to Mr. Quick to show them to him. (Depo. J.

Quick ppg. 108:5 – 109:24; 128:6 – 15; 142:17 – 143:19; 145:18 – 146:21; 147:20 – 22; 148:13 – 25; 155:15 – 156:9).  When A.L. told Mr. Quick that another THS student, R.Y., knew who had posted the Hitler and KKK memes, Mr. Quick and Dr. Flowers approached R.Y.to investigate those two images. (Depo. J. Quick ppg. 147:6 – 150:13; 160:4 – 162:6; Ex. 32).  R.Y. told Mr. Quick and Dr. Flowers that a person named "L" posted the Hitler and KKK memes, and Plaintiff sometimes goes by the name "L." (Depo. J. Quick ppg. 145:24 – 146:4; 158:20 – 159:20; Ex. 32).  The KKK meme constituted a substantial disruption to the Defendant's educational process as was evidenced by A.L. going to Mr. Quick and stating that it had been passed around the school, thus bringing attention to the image's racist portrayal of Mr. Quick and detracting from the school's academic focus. (Depo. R. Flowers ppg. 38:11 – 23; 42:13 – 43:14).  A.L. told Mr. Quick the Hitler meme had also been passed around the school. (Depo. R. Flowers pg. 47:15 – 23).  At least one of these two images were airdropped in the THS gymnasium during school hours, which caused substantial disruption to students during PAWS by drawing their attention to one or both images instead of school-related activities. (Depo. J. Quick ppg. 112:4 – 113:3; 113:21 – 114:16; 118:23 – 119:10; 121:8 – 122:5) (Depo. D. Crutchfield ppg. 28:19 – 30:10).

After Plaintiff finished band practice on August 10, 2022, Justin Scott ("Mr. Scott"), a band director at THS, brought Plaintiff to Mr. Quick's office to discuss the images. (Depo. J. Scott pg. 16:7 – 14) (Depo. I.P. ppg. 77:14 – 22; 81:1 – 2) (Depo. J. Quick ppg. 163:19 – 167:9; Ex. 32).  Prior to the meeting in Mr. Quick's office, Mr. Quick had called Mr. Crutchfield into his office and showed him the five memes believed to have been posted by the Plaintiff. (Depo. D. Crutchfield ppg. 36:24 – 37:18; 39:5 – 16; 41:16 – 42:4).  Plaintiff, Mr. Scott, Mr. Quick and Mr. Crutchfield were present in Mr.

Quick's office during this meeting, and Plaintiff admitted to posting the "Neko Quick" meme, the image of Mr. Quick with vegetables, and the meme with Mr. Quick's head on an Among Us character and Mordecai from "Regular Show." (Depo. I.P. ppg. 59:17 – 60:3; 63:3 – 64:6; 68:17 – 69:12) (Depo. J. Quick ppg. 163:19 – 164:16; 165:13 – 16; 168:3 – 6; Ex. 32) (Depo. D. Crutchfield pg. 59:8 – 17).

After this meeting in Mr. Quick's office, Mr. Crutchfield brought Plaintiff to his office to discuss the social media images further. (Depo. D. Crutchfield ppg. 79:23 – 80:20) (Depo. J. Scott pg. 53:3 – 6). During the meeting in Mr. Crutchfield's office, Mr. Crutchfield advised I.P. he was receiving a 5-day, out-of-school suspension for the images of Mr. Quick. (Depo. D. Crutchfield ppg. 80:7 –20). Shortly after the Plaintiff's meetings with Mr. Quick and Mr. Crutchfield on August 10, 2022, Plaintiff's discipline was reduced to a 3-day out-of-school suspension because Mr. Crutchfield determined that was a more appropriate punishment. (Depo. D. Crutchfield ppg. 82:24 – 83:12) (Depo. B.P. pg. 138:5 – 11). The suspension given to I.P. by Mr. Crutchfield was based upon Mr. Crutchfield's belief that I.P. had posted all fives images to his Instagram account. (Depo. D. Crutchfield ppg. 68:23 – 69:24; 99:23 – 100:9).

As a result of the foregoing events, Plaintiff, by and through his mother, B.P., instituted this action against Defendant Tullahoma City Board of Education as well as Mr. Quick and Mr. Crutchfield in their individual capacities on July 19, 2023. (Doc. 1, Page ID ##1 – 36). On September 21, 2023, Plaintiffs amended their Complaint. (Doc. 36, Page ID ##233 – 277). Moreover, on September 25, 2024, this Court dismissed Mr. Quick and Mr. Crutchfield as defendants in this action on the grounds of qualified immunity and all claims against Defendant Tullahoma City Board of Education except for Plaintiff's 42 U.S.C. §1983 *Monell* liability claim for alleged violations of Plaintiff's

First Amendment free speech rights. (Doc. 109, Page ID ##885 – 905). Plaintiff's mother, B.P., admitted there are no damages that can be recovered as a result of Plaintiff's 3-day out-of-school suspension in August 2022. (Depo. B.P. ppg. 219:22 – 220:11; 227:13 – 228:4).

## II.    ARGUMENT

### (A)    Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) and (c). *See also Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569 (6th Cir. 2012); *Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010). If the burden of persuasion at trial would be on the non-moving party, the moving party can meet its burden of production by either: (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Vaughn v. United States*, 34 F.Supp.3d 773, 776 (N.D. Ohio 2014), aff'd, 635 F. App'x 216 (6th Cir. 2015). Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment. *Hillman v. Shelby County*, 515 Fed. Appx. 365, 370 (6th Cir. 2013). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986) (internal citations omitted). Rather, "the nonmoving party must put forth 'significant probative' evidence in support" of his position in order to avoid summary judgment.

*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). See also *Anderson*, 447 U.S. at 249-50.

**(B)** **Plaintiffs' §1983 municipal liability claim under a *Monell* theory must fail because there was no underlying constitutional violation.**

42 U.S.C.A. §1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C.A. § 1983 (West).

In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality can be found liable under § 1983 where the municipality itself causes the constitutional violation at issue. A Monell claim for municipal liability "must be examined by applying a two-pronged inquiry: (1) [w]hether the plaintiff has asserted the deprivation of a constitutional right at all; and (2)[w]hether the [municipality] is responsible for that violation." *Doe v. Clairborne Cnty., Tenn.*, 103 F.3d 495, 505-06 (6th Cir. 1996). "A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)(citing *Monell*, 436 U.S. at 690-91). The alleged constitutional violation must be caused by a municipality's officially enacted policy or a custom or practice that is "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell* at 691. Respondeat superior or vicarious liability will not attach under §

1983.  It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

For the reasons discussed below, the Defendant had no government policy or custom that inflicted injury to the Plaintiff's constitutional rights because the Plaintiff engaged in speech unprotected by the First Amendment.

**(i) Plaintiffs' remaining §1983 municipal liability claim under a *Monell* theory must fail because there was no underlying constitutional violation since the Plaintiff did not engage in protected speech and, even if he did, such speech created a reasonable forecast of substantial disruption.**

"Congress shall make no law...abridging freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I.  Students' First Amendment rights are not automatically coextensive with the rights of adults in other settings. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).  Thus, students' free speech rights apply "in light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,506 (1969).  In this context, school officials need a degree of flexible authority to respond to disciplinary challenges. *Morse v. Frederick*, 551 U.S. 393, 428 (2007) (Breyer, J., concurring in part and dissenting in part).  Otherwise, courts may inappropriately "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Bd. Of Educ. Of Hendrick Cent. Sch. Dist. V. Rowley*, 458 U.S.176, 206 (1982).

Under Supreme Court First Amendment precedent, schools may regulate student speech that is (1) distractingly lewd or vulgar; (2) promotes illegal drug use; (3) bears

the imprimatur or the school; or (4) causes or reasonably forecasts substantial disruption of, or material interference with, school activities. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986); *Morse v. Frederick*, 551 U.S. 393, 410 (2007); *Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260, 271 – 72 (1988); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 – 14 (1969); see also *Lowery v. Euverard*, 497 F.3d 584, 591 – 92 (6th Cir. 2007) ("*Tinker* does not require school officials to wait until the horse has left the barn before closing the door. Nor does *Tinker* 'require certainty that disruption will occur'"); *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008) (All that a defendant must show is that it "reasonably forecast[ed]" a "material disruption to schoolwork and school discipline" because of the speech); *C.S. v. McCrumb, et. al.*, Case No. 24-1364 (6th Cir. May 2, 2025).

Importantly, a school's regulatory interests can still be significant even if the subject speech is made off-campus and involves behavior such as severe bullying or harassment targeting specific individuals. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2045 (2021). In this setting, a school may regulate the speech of a student and discipline the student so long as the student (1) bore some responsibility for the speech; and (2) the speech substantially disrupted classwork (or the defendant(s) reasonably believed the speech would disrupt classwork). *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 358 (6th Cir. 2023) (citing *Mahanoy* at 2052 (Alito, J., concurring) ("[A] school must have the authority to protect everyone on its premises, and therefore schools must be able to prohibit threatening and harassing speech.").

Here, the subject memes did not constitute protected speech and, even if they did, the special characteristics of the Defendant's school environment allowed school officials to reasonably forecast substantial disruption to its school activities, leading to

the constitutionally permissible suspension of the Plaintiff for posting memes of Mr. Quick. As the memes linked to I.P. touched upon antisemitism, racism, and transphobia, their presence and potential widespread circulation throughout the student body led school administers to reasonably believe that a powder keg would soon be ignited based upon the presence of minority class members directly affected by each of those meme categories within the school community. etcIndeed, even the Plaintiff himself admitted that racial tensions were brewing at THS leading up to the August 10, 2022 incident with the Plaintiff as a result of many students' perception of the THS dress code policy being racially discriminatory and an allegation of Mr. Quick using a racial slur toward a black student. (Depo. I.P. ppg. 40:8 – 41:13; 50:4 – 51:23).

Also relevant is the fact that the Plaintiff also has a history of discipline related to improper digital media use. During his sophomore year, Plaintiff was in a group text with some of his band mates and targeted a former band member, who was still in the group text, with a barrage of insults and other bullying behavior, resulting in an in-school-suspension from the Defendant. (Depo. I.P. ppg. 27:4 – 34:6). This combined with the racial tensions in the Defendant's school system from the students' sentiment of a racist dress code policy and an allegation of racially insensitive behavior by Mr. Quick as well as the diverse makeup of the school's student body made the Defendant's forecast of substantial disruption by the Hitler and KKK memes all the more reasonable.

Additionally, A.L. came to Mr. Quick and Dr. Flowers during the school day on August 10, 2022 distressed about the Hitler and KKK memes. (Depo. J. Quick ppg. 108:5 – 109:24; 128:16 – 15; 142:17 – 143:19; 145:18 – 146:21; 147:20 – 22; 148:13 – 25; 155:15 – 156:9). When A.L. told Mr. Quick that another THS student, R.Y., knew who had posted the Hitler and KKK memes, Mr. Quick and Dr. Flowers approached R.Y. to

investigate those two images. (Depo. J. Quick ppg. 147:6 – 150:13; 160:4 – 162:6; Ex. 32). R.Y. told Mr. Quick and Dr. Flowers that a person named "L" posted the Hitler and KKK memes, and Plaintiff sometimes goes by the name "L." (Depo. J. Quick ppg. 145:24 – 146:4; 158:20 – 159:20; Ex. 32). Furthermore, at least one of the Hitler and KKK memes was airdropped during PAWS on August 10, 2022, the Defendant's equivalent of an activity period in the gymnasium area where up to 100 students would be present[1]. (Depo. J. Quick ppg. 112:4 – 113:3; 113:21 – 114:16; 118:23 – 119:10; 121:8 – 122:5) (Depo. D. Crutchfield ppg. 28:19 – 30:10). Because the Defendant has many Jewish students and families, even the possibility of the memes of Mr. Quick next to Hitler and KKK members circulating is sufficient to reasonably forecast a substantial disruption. (Depo. J. Quick 129:5 – 12).

Furthermore, neither the "Neko Quick" meme nor the meme with Mr. Quick's head on an Among Us character with Mordecai from the Cartoon Network series "Regular Show" were protected speech in the instant case. The Neko Quick meme was a targeted and blatant sexualization of Mr. Quick that he reasonably perceived as an attack. (Depo. J. Quick ppg. 69:9 – 70:6; 70:20 – 71:9; 81:13 – 24). Plaintiff admits that the purpose of him posting this meme was to depict Mr. Quick in a feminine light. (Depo. I.P. pg. 61:14 – 19). "Neko" is Japanese for "cat," referring to either actual cats or to anime or manga characters that have catlike features, but it is also a Japanese slang term for "bottom," or the submissive/receiving partner in a homosexual relationship. According to the Fandom wiki (https://aesthetics.fandom.com/wiki/Neko):

---

[1] An airdrop is a feature of Apple phones that uses Wi-Fi and Bluetooth for users to transmit pictures and videos between each other, and the devices must be within 40 feet of each other. https://discussions.apple.com/thread/8452391?sortBy=rank. However, because Mr. Quick testified that PAWS can have up to hundreds of students present in the gymnasium, it is reasonably foreseeable that the Hitler meme, KKK meme or both would spread to the other students in PAWS and come to the attention of Defendant's school authorities.

Neko is an aesthetic derived from the cat-person trope, primarily catgirls and sometimes catboys, found in anime and manga. While "*neko*" is the Japanese word for cat, "*nekomimi*" accurately refers to cat-people, and "*kemonomimi*" denotes animal-eared people in general. The trope's origins may trace back to 1924,[1] but its popularity surged in the 2010s, becoming integrated into otaku culture. This aesthetic has since permeated meme and stan culture, where image and video edits transform subjects into cat-people....This aesthetic is popular within the transfem community as their ideal post-transition selves.[2] The charm of the Neko aesthetic is its exaggerated childlike femininity. This aesthetic is mostly expressed on TikTok and various other social media platforms.

Furthermore, "transfeminine," (also written as trans-feminine or trans feminine, and sometimes abbreviated to transfem…) describes a person, transgender or otherwise (generally but not exclusively one who was assigned male at birth) who seeks to present femininely, identifies as more female than male, or wishes to transition to look more feminine. https://nonbinary.wiki/wiki/Transfeminine. The sexual nature of the Neko Quick meme is further supported by Plaintiff having a sexualized instagram account with a sexualized screen name and with account descriptions including, "I'm colorblind what's the bi flag," and "You have nothing to lose but your cock and balls." See Answer of Jason Quick, Ex. 1 [sealed Doc. 48 at Pg. 2]. As a result, THS school officials plausibly interpreted Mr. Quick being shown in an apron with cat ears and whiskers as an image of blatant sexualization of Mr. Quick, which made it reasonable for THS school officials to forecast substantial disruption to the Defendant's school activities on August 10, 2022. Mr. Quick himself reasonably believed that this image would forecast substantial disruption to the Defendant's school activities, and the reasonableness of viewing this image as a sexualization of Mr. Quick is reflected in his testimony when he stated it was "very sexual and very penetrating" and sounds "not heterosexual." (Depo. J. Quick ppg. 77:24 – 78:11; 81:13 – 24).

Finally, it is undisputed that Plaintiff had a clear and strong disdain for Mr. Quick. For instance, Plaintiff testified that he did not like Mr. Quick because I.P. perceived that Mr. Quick ignored I.P.'s question to Mr. Quick during a school assembly regarding a THS dress code. (Depo. I.P. 39:15 – 41:20). Plaintiff also stated that Mr. Quick allegedly berated him for being disrespectful toward a substitute teacher; however, the "substitute" teacher was actually the Head of the Math Department at THS. (Depo. I.P. ppg. 41:21 – 43:19). As a result, the only motivation that could have possibly motivated the Plaintiff's creation and dissemination of these memes was malice towards Mr. Quick and a related attempt to disrupt the education process of the school that Mr. Quick was charged with supervising.

For that reason, *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350 (6th Cir. 2023) is instructive. In *Kutchinski*, the plaintiff high school student created a fake Instagram account on a Friday night to impersonate his biology teacher. *Id.* at 353 - 54. On this account, the plaintiff student and two other students posted numerous messages and videos depicting the school's biology teacher in a graphic and sexual manner, such as "[j]ust #gangbanged my wife with 4 other men in the back of an Arby's #notmykid #14inches," "[h]appy 3rd Anniversary to my beautiful wife! #loving #anniversary #STDs," and a video with the caption "[m]ight have to cheat on my wife [two winking emojis #big #14inches." *Id.* at 354. The following Monday, the school principal investigated the account's origins, during which teachers reported several classroom disruptions going on in their rooms and multiple students were called out of the classroom, one of which identified the students involved with the account. *Id.* at 355. The plaintiff-student received a ten-day suspension as a result of his activity on the fake Instagram account impersonating his biology teacher. *Id.* Thereafter, Kutchinski sued

alleging violations of his First Amendment and Fourteenth Amendment rights, and the trial court granted summary judgment to the defendants. *Id.* at 356. On appeal, the Sixth Circuit Court of Appeals ruled that the defendants reasonably forecasted substantial disruption to normal school proceedings would be caused by a Fake Instagram account that impersonated one teacher and directed sexual and violent posts at multiple teachers. *Id.* at 359. Consequently, the Sixth Circuit affirmed summary judgment for the defendants on the plaintiff's First Amendment claim. *Id.* at 360.

This Court should rule in favor of the Defendant on similar grounds. It is clear that the Neko Quick meme constitutes harassment of Mr. Quick by the Plaintiff and a related attempt to disrupt the educational process of Mr. Quick's school because of his strong disdain of Mr. Quick. (Depo. I.P. ppg. 39:15 – 43:19; 47:19 – 51:23). Furthermore, it is undisputed that a biologically male student at the school at the time of the incident regularly opted to wear a dress to school. School administration reasonably forecasted that, unless corrective measures were taken, the educational process of the school would be disrupted as the student body, and certainly the student in question, would believe that Mr. Quick's implicit role in the creation or continued existence of this meme constituted bullying or harassment of this student. Thus, even though this meme was allegedly posted by the Plaintiff off-campus (Depo. I.P. ppg. 59:17 – 60:9), the Defendant's regulatory interests were still significant since it targeted an individual (Mr. Quick) by harassing him with a feminized and sexualized depiction of him with an apron, cat ears and whiskers and would further appear to the student body at large to be bullying and harassing a biologically male member of the school's student population that chose to wear clothes, such as dresses, that are traditionally feminine in nature. It follows then that it was subsequently reasonable for the Defendant's school

officials to forecast substantial disruption to its school activities on August 10th. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2045 (2021); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969).

Likewise, the meme of Mr. Quick on an Among Us character with Mordecai is not protected speech under the First Amendment and the Defendant was thus justified in suspending the Plaintiff for posting this image to his Instagram page. In Among Us, players can choose one of four locations between a spaceship, an above-earth base, a planet base, and a Henry-Strickmin-themed Airship, which contains a group of up to 15 "Crewmates," including up to three "Imposters." Crewmates are hunted and killed by the Imposters in vicious and gratuitous ways, which can be viewed here: https://youtube.com/watch?v=7dt5TX1AS4.

Although the Plaintiff dismissively brushed off this post as satirical commentary on Mr. Quick (Depo. I.P. ppg. 70:17 – 71:11), school students are familiar with Among Us and plausibly could have interpreted[2] this meme as Mr. Quick being a Crewmate who was the victim of a violent murder. Furthermore, given the context of the Neko Quick meme and the vegetables meme that included the caption "like a sister but not a sister," it was reasonable for Mr. Quick to perceive this image as a negative and sexual portrayal of him due to Mordecai, a male character, clutching Mr. Quick's leg with the caption "Nooo Jason don't leave me." (Depo. J. Quick pg. 88:9 – 24) (Depo. I.P. Ex. 5). Mr. Quick's perception to the Among Us meme is especially reasonable because the Plaintiff himself admitted he created the Neko Quick meme to portray Mr. Quick in a feminine light. (Depo. I.P. pg. 61:14 – 19). Thus, even if the Plaintiff posted this image while off-

---

[2] According to recent statistics on Among Us by Sensor Tower and Statista, the game has a total download count of 680 million since launch though the end of 2024 and still had 30 million active users at the end of 2023. https://www.businessofapps.com/data/among-us-statistics/

campus on August 2, 2022, the Defendant's regulatory interests in the subject speech were still significant because it consisted of a threat of violence toward Mr. Quick. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2045 (2021); see also *Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 718 (9th Cir. 2022) (Upholding high school students' suspensions where their posts on an Instagram account targeted specific individuals and used offensive images that "contribute[d] nothing to the 'marketplace of ideas,'" noting that "some of the posts used violent imagery that, even if subjectively intended only as immature attempts at malign comedy, would reasonably be viewed as alarming, both to the students targeted in such violently themed posts and to the school community more generally"). Thus, such speech was not protected, and further, it was reasonably forecast to cause a substantial disruption to the educational process of the school.

The sister circuit case of *Wisniewski v. Weedsport Cent. School Dist.*, 494 F.3d 34 (2d Cir. 2007) is further on point for the case at bar. In *Wisniewski*, the plaintiff-student was suspended for sharing to a group of friends on AOL Instant Messaging a crude drawing suggesting a named teacher should be shot and killed. *Id.* at 35. The plaintiff-student's IM icon was a small drawing of a pistol firing a bullet at a person's head, above which were dots representing splattered blood. *Id.* at 36. Before the icon was taken down, a student informed the subject teacher of the icon, and then the icon came to the attention of the Weedsport Central School District's middle school and high school principals and Superintendent as well as the plaintiff's parents and local police. *Id.* A disciplinary hearing ultimately led the plaintiff-student to be suspended from school for one semester, a lawsuit was then instituted alleging in relevant part that the plaintiff-students AOL IM icon was protected speech under the First Amendment, and the trial court granted summary judgment in favor of the defendants. *Id.* at 37.

On appeal, the Second Circuit affirmed summary judgment for the defendants using the *Tinker* substantial disruption standard. The court reasoned that even if the plaintiff-student's sharing of an icon depicting and calling for the killing of his teacher could be viewed as an expression of opinion within the meaning of *Tinker*, it was student conduct that posed a reasonably foreseeable risk that the icon would come to the attention of school authorities and that it would "materially and substantially disrupt the work and discipline of the school." *Id.* at 38 – 39. The Defendant urges this Court to follow the reasoning of the Second Circuit *Wisniewski* court and hold that the Plaintiff's Among Us and Mordecai meme of Mr. Quick was not constitutionally protected speech and further created a reasonably foreseeable risk of material and substantial disruption to the Defendant's work and discipline. Such a finding by this Court is necessary as, when viewed in context, the subject meme is a call for violence against Mr. Quick to a large student body that understands the appropriate context to make this interpretation despite the Plaintiff's proffered satirical meaning. (Depo. I.P. ppg. 68:17 – 71:24).

As a result then, the Plaintiff did not engage in First Amendment-protected speech in targeting Mr. Quick and, even if he did, the Defendant reasonably forecast significant substantial disruption within the school's educational process caused by the creation and dissemination of the memes. Indeed, the fact that students took it upon themselves to report the existence and wide dissemination of the memes to the school's administration acts as the very evidence of that substantial disruption. As a result, the Plaintiff's discipline of a 3-day out-of-school suspension was constitutionally permissible. It follows then the Plaintiff's suspension did not violate his First Amendment rights, there can be no municipal liability under *Monell*. *Wilson v. Morgan*,

477 F.3d 326, 340 (6th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*) ("There can be no...municipal liability under §1983 unless there is an underlying constitutional act"). Accordingly, the Defendant had no custom or policy that violated the Plaintiff's constitutional rights. Thus, Plaintiff's 42 U.S.C. §1983 *Monell* liability claim against the Defendant must be dismissed.

**(ii) Plaintiffs' remaining §1983 municipal liability claim under a *Monell* theory also fails since the Court granted qualified immunity to the individual defendants whose actions served as the predicate for the Plaintiff's *Monell* claim.**

Finally, because Mr. Quick and Mr. Crutchfield have been granted qualified immunity on the Plaintiff's claim alleging violation of his First Amendment freedom of speech and expression (Doc. 36, Page ID ##253 – 58/¶¶128 – 157) (Doc. 109, Page ID ##893 – 97), the Plaintiff's surviving first amendment claim, based wholly upon the actions of those individual Defendants, must also be dismissed. *White v. City of Detroit*, 569 F. Supp. 3d 650, 658 (E.D. Mich. 2021) (where court found an individual defendant was entitled to qualified immunity on plaintiff's constitutional claim, the city was entitled to judgment on the plaintiff's *Monell* claim on that basis); see also Colorez v. City of Cincinnati, 441 F. Supp. 3d 560, 574 9S.D. Ohio 2020) ("[I]n order to prevail on a § 1983 claim, not only must [the plaintiff] identify a constitutional violation, but he must also show the violation of a 'clearly established' right." (citation omitted)); *Fugett v. Douglas Cnty.*, Case No. 8:21-CV-125, *33 - *34 (D. Neb. 2023) ("...for liability to attach a defendant that has been sued on a *Monell* claim, 'individual liability must first be found on an underlying substantive claim.'").

**(C) B.P. should be dismissed as I.P. has reached the age of majority.**

In their Amended Complaint, the Plaintiffs state that B.P. is I.P.'s mother, and that B.P. brings this action on behalf of her minor son, I.P. (Doc. 36, PageID #: 236; Amended Complaint ¶9). At the time of filing the Complaint, I.P. was still a minor. Since the filing of this lawsuit, I.P. has reached the age of majority and he is currently 19 years of age. (Depo. I.P., pg. 15: 4-8) As I.P. has now reached the age majority, B.P. no longer has authority as a legal representative under Federal Rule of Civil Procedure 17(c), and therefore, should be dismissed as a party in the lawsuit.

Pursuant to Rule 17(c) of the Federal Rules of Civil Procedure, a general guardian may sue or defend on behalf of a minor or an incompetent person.

> [T]he authority of a representative under Rule 17(c) does not necessarily survive until the action has been terminated; rather, his power is dependent upon the continued disability of the person being protected. State law controls the question whether the represented party's disability has ended during the action and once it is determined that this has occurred, the fiduciary loses authority to maintain the suit on behalf of the former infant or incompetent.

*Kloian v. Simon (In re Kloian)*, 179 F. App'x 262, 265 (6th Cir. 2006) (quoting 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1570, at 507 (1990)("Wright & Miller, § 1570")).

In Tennessee a person reaches the age of majority when they reach eighteen (18) years of age. Tenn. Code Ann. § 34-1-102(b). As I.P. reached the age of majority his disability has been removed, and therefore, B.P. no longer has authority to maintain this suit on behalf of I.P., and is no longer a proper party in this lawsuit. Based upon the foregoing, Defendant, Tullahoma City Schools, request that B.P. be dismissed from this suit and summary judgment be granted in favor of the Defendant on this issue.

## III.  CONCLUSION

Based upon the foregoing, Defendant Tullahoma City Schools respectfully requests this Honorable Court to grant its motion for summary judgment.

Respectfully submitted,

SELLERS, CRAIG & HAYDEN, INC.


By:     s/Christopher C. Hayden
Christopher C. Hayden (028220)
Andrew V. Sellers (019586)
Douglas M. Carey (041817)
Attorneys for Defendant
P.O. Box 10547
Jackson, Tennessee 38308
(731). 300-0737
Chris@SCHofcounsel.com
Andrew@SCHofcounsel.com
Doug@SCHofcounsel.com


CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was forwarded by electronic means via the Court's electronic filing system.

s/Christopher C. Hayden
SELLERS, CRAIG & HAYDEN, INC.


Date:     May 12, 2025

PERSONS SERVED:

Conor T. Fitzpatrick
Foundation for Individual Rights and Expression
700 Pennsylvania Avenue, SE Suite 340
Washington, D.C. 20003
Conor.fitzpatrick@thefire.org

Jeffrey D. Zeman
Foundation for Individual Rights and Expression
510 Walnut Street
Philadelphia, PA 19106
Jeff.zeman@thefire.org